## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICA FIRST LEGAL FOUNDATION,

       Plaintiff,

       v.

U.S. DEPARTMENT OF HOMELAND
SECURITY and U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT,

       Defendants.

Case No.: 21-cv-02168-RDM

## PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

BACKGROUND ................................................................................................................... 3

ARGUMENT ....................................................................................................................... 4

I.    FOIA's Privacy Protections Do Not Provide the Same Privacy Rights for Non-Citizens as for Citizens. ............................................................................................. 5

II.   ICE Cannot Rely on Exemption 7 Because the Records were not Created for Law Enforcement Purposes. ................................................................................................ 8

      A.    ICE fails to identify any law enforcement purpose for which these records were created. ..................................................................................................... 8

      B.    ICE ignores that the true purpose behind these records is political. ........................ 10

III.  ICE Fails to Carry Its Burden of Demonstrating the Presence of Sufficient Privacy Interests Under Exemption 7(C). ................................................................................. 11

      A.    ICE fails to demonstrate that it lawfully withheld court case numbers ..................... 11

      B.    ICE fails to demonstrate that it lawfully withheld information about gang, cartel, or terrorist group affiliation. ........................................................................ 16

      C.    ICE fails to demonstrate that it lawfully withheld the names and monikers of aliens identified in the records ...................................................................... 19

      D.    ICE fails to demonstrate that it lawfully withheld dates of birth. ............................ 24

      E.    ICE fails to demonstrate that it lawfully withheld residential addresses. ................ 25

IV.   ICE Fails to Carry its Burden of Demonstrating that its Exemption 7(E) Withholdings Protect Law Enforcement Techniques and Procedures. ..................................................... 26

      A.    ICE fails to demonstrate that the withheld apprehension location and address information constitutes a law enforcement technique or procedure ......................... 26

      B.    ICE also fails to demonstrate that the withheld gang, cartel, and terrorist affiliation information constitutes a law enforcement technique or procedure ......... 29

CONCLUSION ................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. U.S. Dep't of Just.*,
   750 F.3d 927 (D.C. Cir. 2014) ............................................................................... 14

*American Immigration Council v. U.S. Dep't of Homeland Sec.*,
   950 F. Supp. 2d 221 (D.D.C. 2013) ......................................................................... 9

*American Immigration Council v. U.S. Immigration & Custom Enforcement*,
   464 F. Supp. 3d 228 (D.D.C. 2020) .................................................................. 24, 28

*Bartko v. U.S. Dep't of Just.*,
   898 F.3d 51 (D.C. Cir. 2018) ........................................................................ 11

*Boyd v. Crim. Div. of U.S. Dep't of Just.*,
   475 F.3d 381 (D.C. Cir 2007) ...................................................................... 26

*Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. U.S. Dep't of Just.*,
   No. 18-cv-1860 (RDM), 2021 WL 2711765 (D.D.C. July 1, 2021) ........... 12, 13, 14

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*,
   746 F.3d. 1082 (D.C. Cir. Apr. 1, 2014) .......................................... 12, 22, 27, 30

*Concepcion v. FBI*,
   606 F. Supp. 2d 14 (D.D.C. 2009) .............................................................. 20

*Davis v. U.S. Dep't of Just.*,
   968 F.2d 1276 (D.C. Cir. 1992) .................................................................. 21

*Demore v. Kim*,
   538 U.S. 510 (2003) ..................................................................................... 6

*Dep't of Air Force v. Rose*,
   425 U.S. 352 (1976) ..................................................................................... 1

*Dep't of Homeland Sec. v. Thuraissigiam*,
   140 S. Ct. 1959 (2020) ............................................................................ 6, 12

*FBI v. Abramson*,
   456 U.S. 615 (1982) ..................................................................................... 6

*Galvan v. Press*,
   347 U.S. 522 (1954) ..................................................................................... 1

*Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*,
   514 F. Supp. 2d 7, 9 (D.D.C. 2007) ............................................................. 7

*Judicial Watch, Inc. v. U.S. Dep't of State*,
   282 F. Supp. 3d 36 (D.D.C. 2017) ............................................................. 25

*Kay v. FCC*,
   976 F. Supp. 23 (D.D.C. 1997) .................................................................... 8

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) .................................................................................. 1, 6

*Mathews v. Diaz*,
   426 U.S. 67 (1976) ....................................................................................... 6

*Maydak v. Dep't of Just.*,
   254 F. Supp. 2d 23 (D.D.C. 2003) ........................................................... 8, 11

*McKinley v. Bd. of Governors of the Fed. Rsrv. Sys.*,
   849 F. Supp. 2d 47 (D.D.C. 2012) ............................................................. 12

*N.L.R.B. v. Robbins Tire & Rubber Co.*,
   437 U.S. 214 (1978) .................................................................................. 1, 6

*Nation Mag., Washington Bureau v. U.S. Customs Serv.*,
  71 F.3d 885 (D.C. Cir. 1995) ............................................................................... 5

*New Orleans Workers' Ctr. for Racial Just. v. ICE*,
  373 F. Supp. 3d 16 (D.D.C. 2019) ..................................................................... 10

*New York Times Co. v. U.S. Dep't of Homeland Sec.*,
  959 F. Supp. 2d 449 (S.D.N.Y. 2013) ................................................................ 20

*Pinson v. Dep't of Just.*,
  236 F. Supp. 3d 338 (D.D.C. 2017) ..................................................................... 9

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980) ........................................................................................... 13

*Roseberry-Andrews v. Dep't of Homeland Sec.*,
  299 F. Supp. 3d 9 (D.D.C. 2018) ......................................................................... 9

*Rosenfeld v. FBI*,
  No. 07-cv-3240, 2011 WL 13269173 (N.D. Cal. Feb. 23, 2011) ....................... 10

*SAI v. Transp. Sec. Admin.*,
  315 F. Supp. 3d 218 (D.D.C. 2018) ............................................................. 17, 27

*Schiller v. I.N.S.*,
  205 F. Supp. 2d 648 (W.D. Tex. 2002) ................................................................ 7

*Schoenman v. FBI*,
  604 F. Supp. 2d 174 (D.D.C. 2009) ..................................................................... 8

*Thompson v. Dep't of Just.*,
  851 F. Supp. 2d 89 (D.D.C. 2012) ..................................................................... 20

*Tuffly v. U.S. Dep't of Homeland Sec.*,
  870 F.3d 1086 (9th Cir. 2017) ........................................................................... 21

*U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*,
  489 U.S. 749 (1989) ....................................................................................... 5, 16

*Union Leader Corp. v. U.S. Dep't of Homeland Sec.*,
  749 F.3d 45 (1st Cir. 2014) ................................................................... 12, 20, 22

*United States v. Flores-Montano*,
  541 U.S. 149 (2004) ........................................................................................... 16

*United States v. Montoya de Hernandez*,
  473 U.S. 531 (1985) ........................................................................................... 16

*United States v. Ramsey*,
  431 U.S. 606 (1977) ............................................................................................. 7

*Vymetalik v. FBI*,
  785 F.2d 1090 (D.C. Cir. 1986) ........................................................................... 9

*Weaver v. Massachusetts*,
  582 U.S. 286 (2017) ........................................................................................... 13

*Whittaker v. U.S. Dep't of Just.*,
  No. 18-cv-1434-APM, 2019 WL 2569915 (D.D.C. June 21, 2019).................................. 26, 28

*Witte v. United States*,
  515 U.S. 389 (1995).......................................................................................... 13

**Statutes**

5 U.S.C. § 552........................................................................................... 6, 8, 11, 26

**Other Authorities**

Adam Shaw, *Illegal immigrant accused of abduction, rape in Virginia overstayed visa: ICE*,
  Fox News (Aug. 31, 2023)...................................................................................... 22

Anna Giaritelli, *'He should have never been allowed in': Mother demands border fix after
  daughter's murder by suspected MS-13 immigrant*, Wash. Examiner (Feb. 1, 2023) ............. 18

Comm. on Homeland Sec., *A Review of the Fiscal Year 2024 Budget Request for the
  Department of Homeland Security Before the House Committee on Homeland Security*,
  118th Cong. (2023) ............................................................................................ 23

Drug Overdose Death Rates, National Institutes of Health ......................................... 17

*Economy Remains the Public's Top Policy Priority; COVID-19 Concerns Decline Again*,
  PEW RESEARCH (Feb. 6, 2023).................................................................................. 18

J. Baxter Oliphant & Andy Cerda, *Republicans and Democrats Have Different Top Priorities
  for U.S. Immigration Policy*, Pew Rsch. Ctr. (Sept. 8, 2022).................................... 19

Memo. from Alejandro N. Mayorkas, Sec'y, U.S. Dep't of Homeland Sec., to U.S. Immigr. &
  Customs Enf't; U.S. Customs & Border Prot.; U.S. Citizenship & Immigr. Servs.; Off. of
  Strategy, Pol'y, & Plans; Off. for Civ. Rts. & Civ. Liberties; and Priv. Off., Guidelines for the
  Enforcement of Civil Immigration Law (Sept. 30, 2021)........................................... 1

Pew Rsch. Ctr., *Inflation, Health Costs, Partisan Cooperation Among the Nation's Top
  Problems* (2023)................................................................................................ 19

Press Release, U.S. Att'ys Off. for S. Dist. Tex., U.S. Dep't of Just., Sex offender sentenced
  for illegally being in US … for the 9th time (Aug. 23, 2023) .................................. 22

U.S. Deaths Due to Fentanyl Nearly Quadrupled in 5 Years, U.S. NEWS AND
  WORLD REPORT..................................................................................................... 17

**Constitutional Provisions**

U.S. Const. amend. IV ........................................................................................ 7

The Supreme Court has long recognized the Federal Government's authority in matters of immigration and border security. *See Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972); *Galvan v. Press*, 347 U.S. 522, 531 (1954). And the Supreme Court has similarly recognized the importance of the Freedom of Information Act ("FOIA") in ensuring an "informed citizenry." *N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). Indeed, Congress enacted FOIA "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation and quotation marks omitted). This case lands at the intersection of these two principles. While the Federal Government has responsibility for immigration matters, the public must have the information necessary to check agency action and "to hold the governors accountable to the governed." *Robbins Tire*, 437 U.S. at 242.

As discussed in the Defendants' motion, on February 18, 2021, political leadership at Immigration and Customs Enforcement ("ICE") issued an Interim Guidance memorandum setting forth new requirements for ICE agents. ECF No. 26 ("ICE Mot.") at 2. This memorandum was in effect until November 29, 2021, when it was superseded by a September 30, 2021, memorandum issued by Department of Homeland Security ("DHS") Secretary Mayorkas.[1] While in effect, the Interim Guidance implemented new bureaucratic requirements before ICE officers could take enforcement action against non-citizens illegally in the United States. Specifically, before arresting or removing an alien, ICE officers were required to pause and seek approval from Washington, D.C. headquarters. Considering the serious public health and safety risks posed by many such individuals, this added delay left convicted violent criminals and other dangerous aliens in

---

[1] Memo. from Alejandro N. Mayorkas, Sec'y, U.S. Dep't of Homeland Sec., to U.S. Immigr. & Customs Enf't; U.S. Customs & Border Prot.; U.S. Citizenship & Immigr. Servs.; Off. of Strategy, Pol'y, & Plans; Off. for Civ. Rts. & Civ. Liberties; and Priv. Off., Guidelines for the Enforcement of Civil Immigration Law (Sept. 30, 2021), https://tinyurl.com/4t8a3sjm.

communities longer than they otherwise would have been and made an already complex job for ICE officers even more challenging.

 To better understand how this new preapproval requirement was being applied, and the impact it was having in real time, Plaintiff America First Legal Foundation submitted a FOIA request on May 18, 2021, seeking copies of the weekly reports detailing all such enforcement actions where an ICE officer sought to take an enforcement action but was first required to receive political approval. And, while ICE eventually began producing the reports, ICE substantially redacted those reports to withhold many pieces of information that are vital for the public to examine ICE's actions and the propriety of a politically enacted policy that delayed enforcement against violent convicted criminals. The withheld information also deprived the public of information needed to understand other threats posed to the American public by this political preapproval requirement.

 Yet, ICE's redactions find no support in FOIA. For instance, ICE's focus on the privacy interests of aliens named in the requested reports ignores the diminished privacy protections that FOIA provides to non-citizens. And, moreover, ICE fails to carry its burden of showing that *any* cognizable privacy interests are at issue. But even if ICE had carried that burden and showed a cognizable privacy interest, the public interest in knowing how public health and safety are impacted by these policies would far outweigh any privacy interest. Similarly, ICE's attempt to withhold information to protect law enforcement techniques and procedures fails for the simple reason that ICE does not identify any such technique or procedure that would be implicated by disclosure.

Because ICE's withholdings find no support under FOIA, the Court should deny ICE's motion for partial summary judgment and grant Plaintiff's cross-motion for partial summary judgment.

## BACKGROUND

Upon entering office in January 2021, the Biden Administration issued multiple memoranda effecting significant changes in immigration policy. For instance, on January 20, 2021, then-Acting DHS Secretary David Pekoske issued a memorandum titled "Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities." *See* ECF No. 1-1. Shortly thereafter, ICE's Acting Director, Tae Johnson, issued a memorandum to all ICE employees titled "Interim Guidance: Civil Immigration Enforcement and Removal Priorities." *See* ECF No. 1-2 ("Johnson Memo.").

Through these memoranda, ICE's political leadership instituted a political review process for various enforcement actions. Unless an alien fell into one of three categories, ICE officers could not remove an alien without first requesting and receiving political preapproval. *Id.* Additionally, the Johnson Memorandum created a weekly reporting requirement, where two weekly reports would be created and sent to the Acting ICE Director and made available to the Secretary of Homeland Security. *Id.* at 7.

These reports were to be compiled each Friday and include the following: "(1) identifying each enforcement action taken in the prior week, including the applicable priority criterion, if any; (2) providing a narrative justification of the action; and (3) identifying the date, time, and location of the action." *Id.* Thus, these reports catalog all interior enforcement actions and removals completed by ICE since the beginning of the Biden Administration. By reviewing this information against historical ICE data, and other public reporting on crimes committed by the individuals

named in the reports, the public can learn important information about how current political leadership has handled this matter of critical importance.

That is why Plaintiff submitted a FOIA request to ICE on May 18, 2021, requesting copies of the weekly reports required by the Johnson Memorandum. *See* ECF No. 1-3. After receiving no response from ICE, Plaintiff was forced to resort to litigation, filing its Complaint on August 13, 2021. *See* ECF No. 1. After extensive negotiations and the filing of multiple status reports, ICE began reviewing and producing these reports on a periodic basis, releasing 2,000 rows of a cumulative spreadsheet each month. *See* Min. Order (Apr. 7, 2022).

After ICE had processed records for several months, it became clear that several categories of withholdings were improper. Accordingly, Plaintiff requested that the Court permit the parties to file interim motions for summary judgment addressing several categories of withholdings. *See* ECF No. 18 ¶ 12. Otherwise, Plaintiff and the Court would be required to wait years to evaluate the propriety of ICE's withholdings. The Court agreed, and ICE filed its motion for partial summary judgment on August 4, 2023. *See* ICE Mot. at 26. In that motion, ICE addressed several categories of withholdings that Plaintiff had identified. As reflected below, Plaintiff challenges the following withholdings made under Exemptions 6, 7(C), or 7(E): (1) court case numbers; (2) gang, cartel, and terrorist group information; (3) names and monikers; (4) month and year from dates of birth; (5) city, state, and country from residential addresses; and (6) apprehension locations.[2]

## ARGUMENT

ICE's arguments fail for various reasons. As a threshold matter, ICE's privacy arguments fail because ICE asserts privacy interests on behalf of non-citizens that are not cognizable under

---

[2] Accordingly, Plaintiff does not challenge ICE's withholdings under Exemption 3, A-numbers and other identifying numbers, or information about honoring ICE detainers. *See* ICE Mot. at 6–7, 19–21, 30.

FOIA. Further, ICE fails to demonstrate that the records here were created for law enforcement purposes. These reasons alone are sufficient to deny ICE's motion in full.

But ICE's privacy-related withholdings also fail because ICE does not carry its burden of demonstrating that releasing the withheld information would harm any privacy interest. And, even if it did, ICE wholly ignores the substantial public interest in knowing: (1) how the Federal Government is executing the law of a wholly federal responsibility; (2) the types of threats that are present in communities around the country from people who have a demonstrated history of criminal conduct; and (3) how public health and safety are affected by the requirement that ICE officers receive political approval before taking enforcement action.

Finally, ICE's Exemption 7(E) withholdings fail because ICE does not demonstrate that releasing the withheld information would disclose any law enforcement technique or procedure.

## I.    FOIA's Privacy Protections Do Not Provide the Same Privacy Rights for Non-Citizens as for Citizens.

At the outset, the Court should deny ICE's summary judgment motion with respect to all Exemption 6 and 7(C) withholdings because FOIA's privacy protections only apply when a "citizen" is identified in the records. *See U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 780 (1989) ("Accordingly, we hold as a categorical matter that a third party's request for law enforcement records or information about a private *citizen* can reasonably be expected to invade that *citizen*'s privacy[.]") (emphasis added); *see also Nation Mag., Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995) (explaining that there is "a long line of FOIA cases holding that disclosure of the *identities* of private *citizens* mentioned in law enforcement files constitutes an unwarranted invasion of privacy and is thus exempt under 7(C).") (first emphasis in original, second emphasis added).

This limiting construction follows from the general rule that "FOIA exemptions are to be narrowly construed" because "the basic policy of the Act is in favor of disclosure." *FBI v. Abramson*, 456 U.S. 615, 630 (1982). The limitation of FOIA's privacy protection to citizens is also in accord with the overarching purpose of the statutory scheme; that is, "to ensure an informed *citizenry*, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Robbins Tire*, 437 U.S. at 242 (citations omitted) (emphasis added). Citizens are the primary beneficiaries of the FOIA process and correspondingly are provided protection from "invasion[s] of personal privacy" that can arise from the FOIA regime. *See* 5 U.S.C. § 552(b)(7)(C). Because noncitizens are not beneficiaries of FOIA, they do not receive the special protection of Exemptions 6 and 7(C).

The limitation of this statutory exemption to citizens is also consistent with the broader architecture of the protection that U.S. law gives to noncitizens. For example, the Due Process Clause does provide some protections to noncitizens, but the Supreme Court has been clear that, "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Demore v. Kim*, 538 U.S. 510, 521 (2003) (quoting *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976)); *accord Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) ("[T]he due process rights of an alien seeking initial entry … rests on" a very different set of "fundamental propositions: the power to admit or exclude aliens is a sovereign prerogative, … [and] the Constitution gives the political department of the government plenary authority to decide which aliens to admit") (cleaned up). This lower standard for due process and other Constitutional challenges to immigration law flows from Congress's "plenary congressional power to make policies and rules for exclusion of aliens." *Kleindienst*, 408 U.S. at 769. Similarly, there is a long-recognized exception to the Fourth Amendment's prohibition

6

on "unreasonable searches and seizures" for border searches. U.S. Const. amend. IV; *accord United States v. Ramsey*, 431 U.S. 606, 620 (1977) ("The border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country."). Construing FOIA's privacy protections narrowly to exclude noncitizens would thus: (1) further FOIA's "general policy of disclosure"; (2) fit within the statutory purpose of creating "an informed citizenry"; and (3) be consistent with how U.S. law broadly distinguishes between citizens and noncitizens.

To be sure, Plaintiff acknowledges that some courts have concluded otherwise and have applied FOIA's privacy protections to non-citizens. *See, e.g.*, *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 514 F. Supp. 2d 7, 9 n.4 (D.D.C. 2007); *Schiller v. I.N.S.*, 205 F. Supp. 2d 648, 662 (W.D. Tex. 2002). But those courts were not directly presented with the argument that FOIA's privacy protections should not extend to non-citizens, and thus they did not have occasion to pass on this question. And, to the extent those courts concluded that FOIA's privacy protections extend to non-citizens, Plaintiff submits that the decisions cannot be reconciled with FOIA's text or the authority discussed above.

However, if this Court were inclined to follow the decisions in *Judicial Watch* or *Schiller*, it should nonetheless conclude that any privacy interest held by non-citizens is substantially reduced where, as here, the non-citizens are identified in the records due to their illegal presence in the United States, and, in many instances, their previous convictions for criminal activity.

Accordingly, the Court should deny ICE's motion with respect to all Exemption 6 and 7(C) withholdings.

II.     **ICE Cannot Rely on Exemption 7 Because the Records were not Created for Law Enforcement Purposes.**

The next reason to deny ICE's motion is that ICE fails to carry its burden of demonstrating that the records here were created for a law enforcement purpose. But, of course, that is a threshold requirement before ICE may rely on either Exemptions 7(C) or 7(E). *See* 5 U.S.C. § 552(b)(7); *Kay v. FCC*, 976 F. Supp. 23, 37 (D.D.C. 1997), *aff'd*, 172 F.3d 919 (D.C. Cir. 1998). In fact, ICE hardly even attempts to satisfy this burden, relying on the same conclusory statements about law enforcement purpose that other courts have rejected. Moreover, ICE fails to acknowledge that the true purpose behind the creation of the records was political, not law enforcement.

A.      **ICE fails to identify any law enforcement purpose for which these records were created.**

In the Pineiro Declaration, ICE devotes just a *single sentence* to this burden, baldly stating that "[t]he law enforcement records at issue pertain to investigations and enforcement activities conducted pursuant to ICE's law enforcement authorities." Pineiro Decl. ¶ 62 (ECF No. 26-2). The remaining portions of the Pineiro Declaration discussing Exemption 7's threshold merely restate the law and make generalized statements about the role of ICE and general activities of ICE Enforcement and Removal Operations officers. *See id.* ¶¶ 56–62. These perfunctory statements fall far short of satisfying ICE's burden under Exemption 7.

Rather than provide facts to satisfy this burden, ICE joins a growing chorus of federal agencies asking courts simply to assume that records were compiled for law enforcement purposes because the agencies perform some law enforcement functions. *See, e.g., Schoenman v. FBI*, 604 F. Supp. 2d 174, 203 (D.D.C. 2009) ("advis[ing]" the FBI to provide "a more detailed explanation in line with D.C. Circuit case law" on "this threshold question"); *Maydak v. Dep't of Just.*, 254 F. Supp. 2d 23, 38 (D.D.C. 2003) (holding that "BOP's failure to satisfy the threshold law enforcement requirement defeats its motion for summary judgment under exemption 7");

*Vymetalik v. FBI*, 785 F.2d 1090, 1095 (D.C. Cir. 1986) ("FBI records are not law enforcement records simply by virtue of the function that the FBI serves") (citation omitted). ICE's perfunctory statements will not do. True, "[a]gencies classified as law enforcement agencies receive a special deference in their claims of law enforcement purpose." *Pinson v. Dep't of Just.*, 236 F. Supp. 3d 338, 364 (D.D.C. 2017) (citation omitted). But "[t]his review … is not vacuous." *Id.* (quotation marks and citation omitted). And "[n]ot every document compiled by a law enforcement agency satisfies the law enforcement purpose inquiry." *Id.*

In fact, other courts have previously rejected ICE's attempt to rely on similarly circular explanations of law enforcement purpose. In *American Immigration Council v. U.S. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221 (D.D.C. 2013) ("*AIC*"), the court rejected ICE's argument that, "because Plaintiff requested information related to activities that ICE performs in a law enforcement and national security context, this Court can take it for granted that all of ICE's withholdings under Exemption 7(E) automatically satisfy the 'law enforcement purposes' requirement." *Id.* at 246 (cleaned up). The *AIC* court rejected ICE's *ipse dixit*, noting that "similar explanations prepared by ICE's FOIA unit and submitted in other jurisdictions have been deemed insufficient to prove that the underlying records were 'compiled for law enforcement purposes.'" *Id.* (citing cases). Rather, the court held that ICE must provide "an itemized listing of their withholdings and redactions," and that listing must include "a description of the circumstances in which the records were compiled, the relevant law-enforcement activity for each, the nature of the incident or individual involved, and the perceived security risk or likely violation of the law." *Id.* (citations omitted). Other courts have concluded likewise. *See Roseberry-Andrews v. Dep't of Homeland Sec.*, 299 F. Supp. 3d 9, 31 n.10 (D.D.C. 2018) (rejecting ICE's "blanket assertion" that "any records created by a program office that provides support to ICE meet the Exemption 7

threshold"); *New Orleans Workers' Ctr. for Racial Just. v. ICE*, 373 F. Supp. 3d 16, 56 (D.D.C. 2019) (noting that ICE's *Vaughn* index "make[s] no attempt to address the specific law enforcement purpose of the withheld documents"), *vacated pursuant to Stip.*, No. 15-431 (RBW), 2019 WL 4852743 (D.D.C. July 11, 2019).

Yet, ICE relies again on the same conclusory explanation here. And the Court should reject it for the same reason the *AIC* court rejected this argument. ICE has not provided any of the requisite information, and thus it fails to satisfy Exemption 7's threshold requirement.

**B.      ICE ignores that the true purpose behind these records is political.**

Even if ICE had attempted to provide more information, it cannot satisfy this requirement here. While arrests and removals related to immigration-law violations may be law enforcement activities, the records at issue here are not related to those law enforcement duties. Rather, these records were created exclusively for *political* purposes. As noted, the Johnson Memorandum required reports to be created about removal activities to update political leadership. *See* ECF No. 1-2 at 7. In other words, these reports summarize and catalog law enforcement activities, and thus are not part of any such activities. The reports have nothing to do with ICE carrying out its law enforcement functions, and, in fact, only served to add an extra layer of bureaucracy to slow down the process of law enforcement. Talking about a law enforcement activity is not the same thing as engaging in a law enforcement activity. *See, e.g.*, *Rosenfeld v. FBI*, No. 07-cv-3240, 2011 WL 13269173, at *4 (N.D. Cal. Feb. 23, 2011) (explaining that political purposes are distinct from law enforcement purposes under Exemption 7). ICE's political leadership cannot stymie the law enforcement activity of the agency by creating a new preapproval process that did not previously exist, and then turn around and claim the benefit of "law enforcement activity" to shield these new records from release.

Because the reports were not compiled for law enforcement purposes, but rather political purposes, the Court must deny ICE's motion in full. *See Maydak*, 254 F. Supp. 2d at 38.

### III.   ICE Fails to Carry Its Burden of Demonstrating the Presence of Sufficient Privacy Interests Under Exemption 7(C).

Even if the Court were to conclude that FOIA's privacy protections extend to non-citizens, and that ICE satisfied Exemption 7's threshold requirement, ICE has still failed to carry its burden of demonstrating that various Exemption 7(C) withholdings were proper. For each category the Plaintiff is challenging, there are strong factors favoring public disclosure and little to no competing privacy interest. When paired with FOIA's general presumption of disclosure, these are clear reasons to deny ICE's motion with respect to those withholdings.[3]

### A.   ICE fails to demonstrate that it lawfully withheld court case numbers.

Under Exemption 7(C), ICE may only withhold court case numbers if disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). And, even where the disclosure may constitute an invasion of personal privacy, the "privacy interest the government asserts" must "outweigh[] any public interest in disclosure." *Bartko v. U.S. Dep't of Just.*, 898 F.3d 51, 64 (D.C. Cir. 2018).

ICE fails at each turn, and the Court should also reject ICE's attempt to withhold court case numbers from the narrative portions of the spreadsheets. *See* Pineiro Decl. ¶ 79. The privacy interest in those numbers is low, and the public interest is high. Indeed, the docket numbers are already in the public domain, thereby significantly reducing any privacy interest. And releasing this information will allow the public to learn more about the criminal history of those aliens who

---

[3] In its motion, ICE focuses on Exemption 7(C), rather than Exemption 6. However, the shortcomings of ICE's arguments under Exemption 7(C) are equally applicable to its attempt to withhold this information under Exemption 6.

ICE officers were unable to remove without first obtaining political approval. As this Court has held in a similar context, the court case numbers are relevant to "an array of issues of public attention[.]" *Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. U.S. Dep't of Just.*, No. 18-cv-1860 (RDM), 2021 WL 2711765, at *4 (D.D.C. July 1, 2021) ("*Brennan Ctr. III*").

### i.       The public interest in court case numbers is high.

The public interest in issues related to immigration is particularly weighty, as "the Constitution gives 'the political department of the government' plenary authority to decide which aliens to admit[,]" *Thuraissigiam*, 140 S. Ct. at 1982, and "[t]he purpose of FOIA is to require the release of government records upon request and to 'ensure an informed citizenry, vital to the functioning of a democratic society,'" *McKinley v. Bd. of Governors of the Fed. Rsrv. Sys.*, 849 F. Supp. 2d 47, 55 (D.D.C. 2012); *see also Brennan Ctr. III*, 2021 WL 2711765, at *4.

That is why the First Circuit recognized a "significant" public interest in obtaining the names of certain immigrants designated for removal but released. *Union Leader Corp. v. U.S. Dep't of Homeland Sec.*, 749 F.3d 45, 54 (1st Cir. 2014). This was because the names would "enable the [requester] to investigate public records pertaining to the arrestees' prior convictions and arrests, potentially bringing to light" information on ICE's performance of its duties. *Id.* at 56 (citing *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.,* 746 F.3d. 1082, 1093 (D.C. Cir. Apr. 1, 2014) ("*CREW*")).

Releasing court case numbers serves the same public interest because those numbers will allow the public to consider the criminal histories of those aliens who ICE officers sought to remove but were required first to receive political approval. In particular, this information will allow the public to determine if these aliens present serious public safety risks based on their previous criminal activity.

The public interest in dockets will not be satisfied by the information ICE has already provided. For example, in many cases, summaries of the charges of conviction will not contain information on other crimes actually committed and proved by a preponderance of the evidence, which might be taken into account in the sentencing hearing. *See, e.g.*, *Witte v. United States*, 515 U.S. 389, 401 (1995). Indeed, discrepancies between convictions—including those reported in the spreadsheets—and relevant uncharged conduct will assist the public in "[u]nderstanding what the Department means when it describes its efforts to fight" crime. *Brennan Ctr. III*, 2021 WL 2711765, at *2. Furthermore, courts have long recognized the value to the public of evaluating the information contained in a whole trial, which cannot be adequately replicated by mere summaries. *See, e.g.*, *Weaver v. Massachusetts*, 582 U.S. 286, 298–99 (2017); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980) ("When a criminal trial is conducted in the open, there is at least an opportunity both for understanding the system in general and its workings in a particular case"). Thus, the public has an important interest in this information, which cannot be satisfied by the otherwise available information.

### ii. Any privacy interest is low.

The privacy interests here, in contrast, are very low, and they are substantially outweighed by the public interest. This Court's decisions in the *Brennan Center* litigation are instructive. As the Court explained, "the privacy interest at stake in the disclosure of public docket numbers varies depending on the outcome of the underlying case." *Brennan Ctr. III*, 2021 WL 2711765, at *3. Where an individual was acquitted or the charges were dismissed, he has a "much stronger privacy interest[.]" *Id.* But where the case led to a conviction, the individual's privacy interests do not comprise "much more" than "a de minimis privacy interest." *Id.* (cleaned up).

13

Applying those principles here, the Court should conclude that the privacy interests are low in all docket numbers listed in the spreadsheet.[4] With respect to acquittals or dismissals, the *Brennan Center* decision was particularly concerned with the fact that release of the docket numbers would connect the named individuals to charges of terrorism, where such an association is "stigmatic." *Id.* at *4. Similarly, the D.C. Circuit in *ACLU II* was concerned with releasing docket numbers for cases where the government had obtained cellular phone tracking data without a warrant and the case resulted in acquittal. *See ACLU v. U.S. Dep't of Just.*, 750 F.3d 927, 932–33 (D.C. Cir. 2014) ("*ACLU II*"). In both instances, the docket numbers were central to the requests, and release would connect those individuals with specific government action (*e.g.*, terrorism charges or warrantless surveillance). Not so here. Rather, the docket numbers in the records here are ancillary to the request, as docket numbers are merely listed in passing throughout the narrative portions of the spreadsheets. *See* Vaughn Index, Sept. 2022 Production, Row 1636; *id.*, Dec. 2022 Production, Row 883.

To be sure, individuals whose cases resulted in acquittals or dismissals "have a much stronger privacy interest in controlling information concerning those prosecutions," but that privacy interest is still not absolute. *Brennan Ctr. III*, 2021 WL 2711765, at *4 (quoting *ACLU II*, 750 F.3d at 933). And there is no basis here to conclude that releasing docket numbers (even for cases resulting in acquittals) will cause any additional public attention to the specific criminal allegations. Here, the primary focus is on the government's actions, not the individual's actions. And a criminal non-citizen cannot be entitled to any more privacy interests under FOIA than an

---

[4] It is striking that ICE persists in withholding court case numbers despite this Court's holdings in the *Brennan Center* litigation. ICE's refusal to follow that clear guidance casts serious questions on the reasonableness of the other positions ICE takes in this case.

acquitted citizen, so the privacy interest due to the individuals in the spreadsheets at issue here must be less than what ICE argues.

Even if the Court were to conclude that docket numbers for acquittals should be withheld, the Court's *Brennan Center* decisions confirm that ICE cannot withhold docket numbers where the cases resulted in convictions. And the Vaughn Index includes many such court case numbers. *See, e.g.*, Vaughn Index, June 2022 Production, Row 41 (domestic-violence conviction); *id.*, June 2022 Production, Row 525 (conviction for sexual assault of female child age 6); *id.*, Dec. 2022 Production, Row 883 (drug-trafficking conviction); *id.*, Nov. 2022 Production, Row 921 (guilty plea for "pre-planned execution-style murder"). This Court in *Brennan Center III* assessed privacy interests for cases where an individual was convicted of terrorism-related charges. 2021 WL 2711765, at *4. And, as the Court explained, such cases carry significant stigma. *Id.* Yet the Court still concluded that there is barely more than a *de minimis* privacy interest in docket numbers where the individual was convicted of such charges. *Id.* at *3. If individuals convicted of charges as stigmatic as terrorism have a low privacy interest, it follows that the individuals named here have even less of a privacy interest because they were convicted of less-stigmatic charges. And ICE's resort to an across-the-board withholding of all court case numbers cannot be squared with this authority.

Accordingly, the Court should order ICE to release these docket numbers. And it is no answer to hide behind a claim of a heightened privacy interest because the docket numbers "include those for many crimes unrelated to an immigration status and not prosecuted by ICE." ICE Mot. at 19. It is of no moment whether the alien's criminal history relates to an ICE prosecution. The question is whether ICE is successfully removing aliens with a history of criminal activity, including those with violent criminal histories.

When analyzing this question, context is important. Indeed, the Court must consider the Constitutional and common-law privacy interests when evaluating the privacy interests conferred by FOIA exemptions. *See Reps. Comm. for Freedom of Press*, 489 U.S. at 767 (looking to "common-law and dictionary understandings"). Looking to these standards, there is a limited expectation of privacy in contexts related to border security. *See, e.g.*, *United States v. Flores-Montano*, 541 U.S. 149, 154 (2004) ("suspicionless disassembly of" an automobile fuel tank was acceptable because "the expectation of privacy is less at the border than it is in the interior."); *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985) ("Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant"). This diminished privacy interest should inform the Court's analysis of whether ICE has sufficiently identified any privacy interests here.

Accordingly, the Court should order ICE to release all court case numbers because any privacy interests are low and substantially outweighed by the public interest.

**B.      ICE fails to demonstrate that it lawfully withheld information about gang, cartel, or terrorist group affiliation.**

ICE also fails to carry its burden of demonstrating that it properly withheld information about gang, cartel, or terrorist group affiliations. Pineiro Decl. ¶¶ 87–88. In fact, for these withholdings, ICE argues, without citing a single source of authority, that a convicted felon cartel member's right to privacy and be "free from harassment" outweighs the public's right to know about the dangers posed by those cartel members' presence in the country. ICE Mot. at 23–24. That is a remarkable argument, where ICE puts the interests of cartel members—the organizations

16

smuggling fentanyl and other drugs into this country killing 100,000 people a year[5]—above the interests of the American public.

The Court should reject the notion that cartel and gang members have any privacy interest in hiding their identity under FOIA, and thus no balancing is required. But even if the Court proceeds to balancing, the Plaintiff should prevail because the interests of a cartel member to be free from harassment cannot outweigh the American public's right to know about matters of public safety.

i.  **Cartel and Gang Members have no privacy interests.**

With respect to privacy, ICE musters only the speculative statement that "[t]he release of the criminal organization affiliation in conjunction with the compilation of other information included in the Spreadsheet Report *could be* used to identify the non-citizens at issue." *Id.* ¶ 87 (emphasis added). But ICE does not even attempt to explain *how* that would be possible, considering its broad redactions of many other pieces of information about the individuals listed in the spreadsheet. And such speculation is not enough to support an assertion of a privacy interest under Exemption 7(C). Rather, ICE has the burden of demonstrating that a privacy interest would be implicated by release. *See SAI v. Transp. Sec. Admin.*, 315 F. Supp. 3d 218, 233 (D.D.C. 2018) (quotation marks and citation omitted) (noting that an agency's declarations must be "relatively detailed and non-conclusory" to carry the agency's burden). Indeed, ICE does not explain how releasing passing references to such criminal organizations would implicate any cognizable privacy interest of a specific individual.

---

[5] Drug Overdose Death Rates, National Institutes of Health, https://tinyurl.com/uzmntdjb (last accessed Sept. 14, 2023); U.S. Deaths Due to Fentanyl Nearly Quadrupled in 5 Years, U.S. NEWS AND WORLD REPORT ("The latest tally from the CDC … in fentanyl-related overdose deaths … is over 107,000 people in the 12-month period ending in August 2022"), https://tinyurl.com/3kdbjcrm (last accessed Sept. 14, 2023).

Even accepting ICE's premise that a name could be identified, it still does not explain how or why cartel members are entitled to any privacy interests. Considering that ICE could not muster a single authority for this category of withholdings (ICE Mot. at 23–24), it is unsurprising that ICE was unable to demonstrate any privacy interests that would be implicated by release.

### ii.   There is overwhelming public interest in this information.

Equally unavailing is ICE's wholesale refusal to acknowledge any public interest. Instead, ICE baldly states that releasing this "information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities." Pineiro Decl. ¶ 88. That blinks reality. The public is keenly interested in knowing the level to which members of foreign gangs or other criminal enterprises are in the United States illegally, and what the Federal Government is doing about it.[6]

Recent polling from Pew Research suggests this is a matter that crosses the political spectrum and is a pressing concern to a majority of Americans, regardless of political or partisan affiliation. For instance, 53% of Americans say that dealing with immigration is a top priority for them, and the same number say that reducing the availability of illegal drugs is also a top priority. And 57% of Americans say that reducing crime is a top priority.[7] Further, 73% of Americans think that it is either "very" or "somewhat" important to increase border security.[8] And, when asked to name problems that are "very big" in America today, 61% responded that drug addiction is an

---

[6] *See, e.g.*, Anna Giaritelli, *'He should have never been allowed in': Mother demands border fix after daughter's murder by suspected MS-13 immigrant*, Wash. Examiner (Feb. 1, 2023), https://tinyurl.com/7ehpuxab.

[7] *Economy Remains the Public's Top Policy Priority; COVID-19 Concerns Decline Again*, PEW RESEARCH (Feb. 6, 2023), https://tinyurl.com/9ut7r6a3.

[8] J. Baxter Oliphant & Andy Cerda, *Republicans and Democrats Have Different Top Priorities for U.S. Immigration Policy*, Pew Rsch. Ctr. (Sept. 8, 2022), https://tinyurl.com/4x3uvve3.

issue, and 59% said that violent crime is a major issue.[9] All of these data points indicate a strong public interest in releasing information related to gang and cartel activity.

Indeed, such information would show the public safety risks posed by such individuals and by the bureaucratic red tape that the Johnson Memorandum imposes. Undoubtedly, the public would be interested to know if a member of a violent cartel who is in the United States illegally cannot be immediately removed because the ICE officer was required to first receive political approval. Armed with such information, the public may be able to petition the government to change such a potentially harmful policy. For instance, the public would undoubtedly benefit from knowing more about the individual listed on ICE's Vaughn Index at 98, where the individual appears to be convicted of abusing his wife and is also a cartel member. According to ICE, this person's privacy interest outweighs the public's interest. That cannot be the case.

Accordingly, the Court should order ICE to release the withheld gang, cartel, and terrorist group affiliations.

### C.   ICE fails to demonstrate that it lawfully withheld the names and monikers of aliens identified in the records.

For similar reasons, ICE fails to justify its decision to withhold names and monikers of aliens identified in the records. With respect to the privacy interest, ICE significantly overstates the interests at play. According to ICE, the aliens named in the records here "have an undisputable privacy interest in not being publicly associated with both criminal and non-criminal law enforcement efforts[.]" ICE Mot. at 13. But that misunderstands the law. The records here only identify aliens for whom enforcement action has been approved. *See* Johnson Memo. at 7. And, as noted above, many such records discuss public aspects of their background (*e.g.*, previous

---

[9] Pew Rsch. Ctr., *Inflation, Health Costs, Partisan Cooperation Among the Nation's Top Problems* (2023), https://tinyurl.com/2sphrcr4.

convictions, gang affiliation, etc.). As the First Circuit explained in a similar case involving ICE records, "although the arrestees have a cognizable privacy interest in their names, that interest is attenuated both by the status of their underlying convictions and arrests as matters of public record and by the limited nature of the [requester's] proposed investigation." *Union Leader*, 749 F.3d at 54; *accord New York Times Co. v. U.S. Dep't of Homeland Sec.*, 959 F. Supp. 2d 449, 450, 455 (S.D.N.Y. 2013) (noting the "significantly diminished" privacy interest of those named in "a list of all aliens since 2008 who, after being convicted of a crime and serving their sentence, were designated for removal but were released from DHS custody").

Importantly, this case differs substantially from many other cases where courts analyzed the privacy interests of third parties incidentally named in law enforcement records. Here, Plaintiff seeks only the names of the aliens listed in the spreadsheet for enforcement actions. Plaintiff does not seek the names of third parties who are inadvertently listed in the records. Accordingly, the myriad cases discussing third parties incidentally listed in law enforcement records are inapposite. *See, e.g.*, *Thompson v. Dep't of Just.*, 851 F. Supp. 2d 89, 99 (D.D.C. 2012) (discussing, among other things, third parties "merely mentioned in documents related to the FBI's criminal investigation"); *Concepcion v. FBI*, 606 F. Supp. 2d 14, 40 (D.D.C. 2009) (discussing withholding of third-party names "merely mentioned in the law enforcement investigatory records"). The aliens listed in the requested records are not "incidentally named" in law enforcement records. Rather, they are listed because an ICE agent sought to take enforcement action against them, *and* the ICE political leadership approved that action. Moreover, any privacy interest is even further reduced by the fact that many entries in ICE's spreadsheet do not even list an alien's full name. *See, e.g.*, Vaughn Index, Feb. 2022 Denials Tab, Row 27; *id.*, June 2022 Production, Row 41.

20

The authority on which ICE relies is unavailing. For instance, ICE relies heavily on the Ninth Circuit's decision in *Tuffly v. U.S. Dep't of Homeland Sec.*, 870 F.3d 1086 (9th Cir. 2017). ICE Mot. at 14. But *Tuffly* addressed a list of detainees who had been released in the United States pending final determination on removal. 870 F.3d at 1090. In that context, the court discussed concerns about how those detainees may be treated if their names were released. *Id.* at 1096. That is not the case here, where the aliens listed in the requested records have been approved for removal or other enforcement action, and thus are not at the same risk of "harassment, embarrassment, or stigma." *Id.* And the conclusory statements ICE offers in the Pineiro Declaration do not suffice to identify an adequate privacy interest. *See* Pineiro Decl. ¶ 64 (baldly stating that releasing the names of non-citizens "could reasonably be expected to constitute an unwarranted invasion of privacy").

But whatever the privacy interests held by aliens in this case, they are significantly outweighed by the public's interest in "be[ing] informed about what their government is up to." *Davis v. U.S. Dep't of Just.*, 968 F.2d 1276, 1282 (D.C. Cir. 1992). Again, the records at issue here reflect information about aliens who ICE agents concluded should be removed or subject to other enforcement actions. *See* Johnson Memo. at 7. In many instances, as noted above, that is due to their involvement in gang activity or other violent crimes. Yet those agents were not permitted to act on their expertise. Rather, they were required first to receive political approval. *See* Johnson Memo. at 6–7.

The public has a keen interest in knowing more about the individuals that ICE agents were unable to remove without first receiving political approval. By receiving names, the public will be able to determine if the same person appears multiple times in the records, confirming that the same individual is repeatedly subject to removal actions. As the First Circuit explained in *Union Leader*, this type of information serves an important public interest: "Disclosure of the redacted

21

names will enable the Union Leader to investigate public records pertaining to the arrestees' prior convictions and arrests, potentially bringing to light the reasons for ICE's apparent torpor in removing these aliens." 749 F.3d at 56. The D.C. Circuit has recognized a similar public interest, where "[d]isclosure of the records would likely reveal much about the diligence of the FBI's investigation and the DOJ's exercise of its prosecutorial discretion: whether the government had the evidence but nevertheless pulled its punches." *CREW*, 746 F.3d at 1093. In this context, releasing the names provides more than "mere information about private citizens," but rather will "forward the legitimate public interest in knowing what the Government is up to[.]" *Union Leader*, 749 F.3d at 56 (cleaned up).

Here, there can be no dispute that the public has a strong interest in knowing more about how ICE removes individuals, including whether it must devote resources to removing the same individual multiple times.[10] Releasing the names of aliens included in the reports will allow the public to determine when individuals are on those lists multiple times, and thus clearly pose a greater risk. And it will allow the public to review other material about these individuals to learn the potential risks created by ICE political leadership's decision to require ICE officers to spend additional time before proceeding with any enforcement action.

In fact, just such an issue arose at a recent Congressional hearing. On April 19, 2023, during a Congressional oversight hearing at the House Committee on Homeland Security, Representative Ezell questioned the Secretary of Homeland Security about a specific instance of ICE officers

---

[10] Press Release, U.S. Att'ys Off. for S. Dist. Tex., U.S. Dep't of Just., Sex offender sentenced for illegally being in US … for the 9th time (Aug. 23, 2023), https://tinyurl.com/3vcnyayn; Adam Shaw, *Illegal immigrant accused of abduction, rape in Virginia overstayed visa: ICE*, Fox News (Aug. 31, 2023), https://tinyurl.com/2mbf4nk6; Charles Creitz, *Illegal immigrant mass murder suspect captured was deported five times, ex-detective says*, Fox News (May 2, 2023), https://tinyurl.com/yd89sh6k.

being required to seek preapproval before removing an alien who had been convicted of possession with the intent to distribute 10 kilograms of methamphetamine.[11] An elected Representative, using the information published by the Plaintiff to question the Secretary of Homeland Security about a political policy, is the essence of public interest. And further details could have been elicited, had ICE not withheld names and other information. For instance, with a name, case number, and gang information, further ties could be drawn to illustrate the full impact of the Department's policies.

Thus, while there may be an inclination to summarily bless ICE's across-the-board withholding of names from these records, a closer look at the Pineiro Declaration confirms that ICE has failed to demonstrate the privacy interests that disclosure would implicate. Indeed, while ICE proposes that it be permitted to withhold *all* names, ICE would be hard pressed to support that argument for *all* aliens listed in the records. As discussed above, many such individuals have been convicted of heinous crimes, and their privacy interests (if any) are substantially diminished. Moreover, ICE has wholly failed to address the public interest through its bald statement that releasing "the non-citizen's name serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities." Pineiro Decl. ¶ 66. Accordingly, the Court should order ICE to release the names of the aliens listed in the records.[12]

---

[11] Comm. on Homeland Sec., *A Review of the Fiscal Year 2024 Budget Request for the Department of Homeland Security Before the House Committee on Homeland Security*, 118th Cong. (2023), YouTube, at 2:44:24 (Apr. 19, 2023), https://tinyurl.com/3x5xpxkb.

[12] The same is true for ICE's withholding of monikers, which ICE characterizes as "AKAs" and "alias." Pineiro Decl. ¶ 73. According to ICE, monikers "can be linked to and identify an individual[.]" *Id.* That proposition fails for at least two reasons. First, ICE offers nothing beyond its own speculation that monikers listed in the spreadsheets "can be linked to and identify an individual[.]" Second, even if the moniker could be connected to an individual, this argument fails for the same reason as ICE's attempt to withhold names—the public's interest far outweighs any privacy interest.

**D.      ICE fails to demonstrate that it lawfully withheld dates of birth.**

Moving to ICE's withholding of full dates of birth, ICE clearly cannot carry its burden under Exemption 7(C). Indeed, another Court in this District has rejected the same withholdings in a substantially similar case. In *American Immigration Council v. U.S. Immigration & Custom Enforcement*, 464 F. Supp. 3d 228 (D.D.C. 2020), the requester sought "a complete dataset containing detailed information about all individuals who were apprehended by U.S. Customs and Border Protection; encountered by [ICE]; or removed from the United States between January 1, 2016 and October 10, 2017." *Id.* at 233. Among other withholdings, ICE withheld dates of birth from those datasets. *Id.* at 234. According to ICE, it "withheld birth dates from their productions to protect the privacy of third-parties," and because releasing such information "could expose the individual to identity theft and may reasonably lead to unwanted contact from persons that might seek to harm the individual." *Id.* at 237. This bears striking similarity to the justifications ICE offers here. *See* Pineiro Decl. ¶ 71 (stating that ICE withheld dates of birth because they "can be used to identify" individuals).

The *American Immigration Council* court rejected those arguments, holding that ICE relied on "very vague and speculative harms[.]" 464 F. Supp. 3d at 239. Further, the court held that "there is no genuine dispute that the government can adequately protect whatever minimal privacy interests the detainees have in their birthdates by redacting the date but not the month and year, because the agency has not identified any harm that would flow from a more limited disclosure, and the statute requires that reasonably segregable portions of records should be provided." *Id.* So too here.

As Plaintiff explained during the parties' meet-and-confer process, ICE should release at least the month and year for each entry on the reports. And, because ICE cannot identify any privacy interest in the month and year of birthdates, that is the end of the analysis. *See Judicial*

*Watch, Inc. v. U.S. Dep't of State*, 282 F. Supp. 3d 36, 42 (D.D.C. 2017) (explaining two-part test under Exemption 7(C)). But even if the Court determined that it needed to evaluate the public interest, releasing this minimal birthdate information will allow the public to assess better the ages of those for whom ICE allocates resources for removal. Here again, this information will help to better understand the potential public safety risks posed by those who are subject to removal and will help inform the public debate about what additional steps could be taken to reduce illegal border crossings.

Accordingly, just as ICE's arguments failed in *American Immigration Council*, they fail here, and the Court should order ICE to release months and years for any birthdates listed in the underlying records.

E.     **ICE fails to demonstrate that it lawfully withheld residential addresses.**

Finally, ICE also fails to carry its burden of demonstrating that it may withhold the full residential addresses listed in the narrative portions of the various records. As ICE explains, it withheld "[f]ull residential addresses, which include street name and number, apt/unit number, as well as the city and state of the address[.]" Pineiro Decl. ¶ 76. This information, ICE suggests, "can be used to identify and/or locate the non-citizens at issue[.]" *Id.* ¶ 75. But Plaintiff does not seek the *full* address information. Rather, Plaintiff challenges only ICE's redacting city, state, and country information.

This segregable information would not implicate the privacy interests ICE identifies. *See id.* ¶ 77 (stating that disclosure of this information "could also potentially identify other third parties that either are associated with or residing with the non-citizen at the subject residential address, or other unrelated third parties who at one time lived at the listed address."). By disclosing only the city, state, and country information, there is no risk that the address could be linked to specific individuals or locations. And there is no risk that releasing this information could

"expose[] [individuals] to harassment, criticism, intimidation, or undue public attention that directly violates their privacy rights." ICE Mot. at 22–23. Thus, ICE cannot demonstrate a privacy interest in this information. *See Boyd v. Crim. Div. of U.S. Dep't of Just.*, 475 F.3d 381, 385 (D.C. Cir 2007) (ICE has the "burden of demonstrating that the withheld documents are exempt from disclosure."). And FOIA requires release of such segregable portions of records. 5 U.S.C. § 552(b).

But even if there were a slight privacy interest in this information, the public interest would outweigh it. The public has an interest in knowing the locations from which aliens subject to removal came. This is deeply relevant to discussions about how the federal government interacts with neighboring countries. And it would shed light on whether there are certain countries that should receive additional scrutiny. Accordingly, because ICE has failed to identify any privacy interest sufficient to withhold the city, state, and country address information included in the spreadsheets, the Court should order ICE to release all such information.

## IV.   ICE Fails to Carry its Burden of Demonstrating that its Exemption 7(E) Withholdings Protect Law Enforcement Techniques and Procedures.

ICE also fails to carry its burden of justifying its Exemption 7(E) withholdings. Specifically, ICE fails to carry its burden with respect to redacting: (i) apprehension locations and addresses; and (ii) names of gangs, terrorist groups, and monikers. Unless ICE demonstrates that each withholding would "disclose techniques and procedures for law enforcement investigations or prosecutions, or [] disclose guidelines" for such investigations or prosecutions, the Court must deny ICE's motion. 5 U.S.C. § 552(b)(7)(E); *Whittaker v. U.S. Dep't of Just.*, No. 18-cv-1434-APM, 2019 WL 2569915, at *1, *3 (D.D.C. June 21, 2019).

### A.   ICE fails to demonstrate that the withheld apprehension location and address information constitutes a law enforcement technique or procedure.

With respect to apprehension locations, ICE asserts that it withheld "information on the specific locations of the apprehensions of non-citizens entering the U.S." Pineiro Decl. ¶ 115. From

there, ICE asserts that disclosure of this information "*could* reveal techniques and procedures, as well as guidelines for law enforcement investigations or prosecutions, which *could* reasonably be expected to risk circumvention of the law." *Id.* ¶ 116 (emphases added). Adding speculation on top of speculation does not carry ICE's burden. *SAI*, 315 F. Supp. 3d at 233. Not only is ICE simply speculating that this information *might* risk circumvention of the law, but it is also important to note what is missing from ICE's declaration. ICE does not argue that apprehension locations are part of any law enforcement technique or procedure. *See generally* Pineiro Decl. ¶¶ 114–19. Indeed, based on the Pineiro Declaration, it is equally possible that the apprehension locations were the product of chance.

The D.C. Circuit has previously rejected similarly vague justifications for Exemption 7(E) withholdings. In *CREW*, the D.C. Circuit rejected DOJ's "near-verbatim recitation of the statutory standard [as] inadequate" where DOJ had asserted Exemption 7(E) "to protect procedures and techniques used by FBI [agents] during the investigation." 746 F.3d at 1102 (alteration in original; citation omitted). This was insufficient, the D.C. Circuit explained, because: "We are not told what procedures are at stake. (Perhaps how the FBI conducts witness interviews? Or how it investigates public corruption?)." *Id.* Additionally, the D.C. Circuit noted that DOJ had not explained how releasing the withheld information "could reveal such procedures." *Id.* For instance, "[a]re the procedures spelled out in the documents? Or would the reader be able to extrapolate what the procedures are from the information contained therein?" *Id.* Acknowledging the "low bar" to justify Exemption 7(E) withholdings, the D.C. Circuit nonetheless held that "the agency must at least provide *some* explanation of what procedures are involved and how they would be disclosed." *Id.* (emphasis in original).

27

Here, ICE has failed to provide any such information, which distinguishes this case from *American Immigration Council*, 464 F. Supp. 3d 228, on which ICE relies. ICE Mot. at 28. While true that the court in that case held that apprehension location data could be withheld under Exemption 7(E), the facts were substantially different. 464 F. Supp. 3d at 244–45. Plaintiff's request here seeks various reports about ICE removal activities. In contrast, the request in *American Immigration Council* sought information about "all apprehensions and arrests over a 34-month period across the United States." 464 F. Supp. 3d at 245 (cleaned up). And the agency provided a declaration in that case explaining that "[t]he substantive effect of over 1 million points of location data would be the disclosure of law enforcement techniques and procedures" because it would provide information on all "operations, arrests and apprehensions and staffing and specific ports of entry[.]" *Id.* The request here does not come close to implicating the same volume of information, as releasing apprehension locations here would not provide a full listing of all apprehension activity over a series of years.

Rather, the records here bear more similarity to those at issue in *Whittaker*, where the FBI sought to withheld various name-check *results* under Exemption 7(E). 2019 WL 2569915, at *1. The apprehension information here is simply the *result* of ICE actions, and "[t]he phrase techniques and procedures … refers to how law enforcement officials *go about* investigating a crime." *Id.* at *2 (quotation marks omitted; alteration and emphasis in original). Just as "[d]isclosing the results of Plaintiff's National Agency Check would not necessarily reveal how the FBI 'goes about' collecting information returned from such inquiries," releasing the apprehension location information does not explain how ICE "goes about" using any law enforcement technique or procedure. *Id.*

If ICE uses specific techniques and procedures to determine apprehension locations, it must say as much. By failing to do so, ICE asks the Court to assume that this withheld information would divulge a law enforcement technique or procedure, which this Court cannot do. *Id.*

**B.      ICE also fails to demonstrate that the withheld gang, cartel, and terrorist affiliation information constitutes a law enforcement technique or procedure.**

Similarly, ICE's attempt to withhold gang, cartel, terrorist affiliation and monikers under Exemption 7(E) fails for the same reason as under Exemption 7(C). Releasing this information will not divulge the information ICE suggests. According to ICE, this information must be withheld because it was the result of "law enforcement agencies identifying, based on intelligence and law enforcement review, the criminal organization groups, for which the non-citizens … are or suspected to be affiliated with." Pineiro Decl. ¶ 130. Plaintiff does not doubt the importance of withholding gang-related information when releasing it would show that a law enforcement agency has recruited valuable sources inside that gang. Nor does Plaintiff doubt the importance of withholding such information when a law enforcement agency has infiltrated an organization and releasing the name of the gang would divulge that law enforcement activity.

But that case is not this case. Rather, the records here show that ICE officers merely referenced the gang affiliation in passing. *See, e.g.*, Vaughn Index, Nov. 2022 Production, Row 921; *id.*, Nov. 2022 Production, Row 1725; *id.*, Dec. 2022 Production, Row 136. In many instances, that is likely the result of nothing more than observing physical markings (such as tattoos) or speaking with the individual. And ICE has not come close to demonstrating that this is the type of case where releasing gang, cartel, or terrorist group information will cause any harms. Again, despite Exemption 7(E)'s low bar, the D.C. Circuit confirms that ICE "must at least provide *some* explanation of what procedures are involved and how they would be disclosed." *CREW*, 746

29

F.3d at 1102 (emphasis in original). ICE has not done so, and the Court should therefore deny ICE's motion.

## CONCLUSION

The public has a keen interest in knowing more about how the Federal Government applies immigration law to protect U.S. citizens. Here, the public record shows that political leadership has imposed additional hurdles that frustrate immigration enforcement. Only by requiring ICE to release the withheld information can the public learn about the public health and safety risks posed by this policy. Accordingly, the Court should deny ICE's motion for partial summary judgment and grant Plaintiff's motion.

September 15, 2023                              Respectfully submitted,

                                               */s/ Brian J. Field*
                                               BRIAN J. FIELD
                                               D.C. Bar No. 985577
                                               SCHAERR | JAFFE LLP
                                               1717 K Street NW, Suite 900
                                               Washington, DC 20006
                                               Tel.: (202) 787-1060
                                               Email: bfield@schaerr-jaffe.com