**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

AMERICA FIRST LEGAL FOUNDATION,

       *Plaintiff*,

    v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

       *Defendants*.

Civil Action No. 21-2168 (RDM)

---

**MEMORANDUM OPINION AND ORDER**

Plaintiff America First Legal Foundation ("AFLF") brings this action against Immigration and Customs Enforcement ("ICE") and its parent agency, the Department of Homeland Security ("DHS"), seeking to compel ICE to respond to AFLF's May 18, 2021, Freedom of Information Act ("FOIA") request. Dkt. 1. Early in the proceedings, ICE reported that it had conducted multiple searches and had identified over 20,000 pages of potentially responsive records, as well as approximately 140 excel spreadsheets that included potentially responsive material. Dkt. 18 at 1–2. The Court, in turn, ordered ICE to process "at least 2,000 rows" of material from the cumulative spreadsheets or 500 pages of records each month. *Id.* at 2. Concerned that the processing of records would take years to complete, AFLF sought leave to file an early motion for summary judgment to resolve any disputes between the parties regarding ICE's withholdings from the spreadsheets. As AFLF explained, ICE was consistently applying the same withholdings in each monthly release of rows from the spreadsheets, and by addressing the permissibility of those withholdings before the productions were complete, the Court could

provide the parties with guidance as the process continued to unfold and could avoid the need for any "do-overs."

The Court agreed to AFLF's proposal on the condition that AFLF agree not to raise any alternative or new grounds for relief at a later point in the case, except to the extent that ICE altered existing or adopted new parameters for withholding responsive material. AFLF accepted that condition, which was intended to avoid the inefficiency of multiple rounds of summary judgment briefing, and the Court permitted AFLF to identify 40 sample rows from the spreadsheets for ICE to include in its *Vaughn* index. With that framework in place, the parties have now briefed the disputed withholdings, which all turn on the application of FOIA Exemptions 6, 7(C), and 7(E). Dkt. 26-1, Dkt. 29, Dkt. 32, Dkt. 33. The parties disagree about whether ICE has permissibly redacted the columns of the spreadsheets that contain information that, in ICE's view, unduly intrude on privacy interests or reveal law enforcement techniques and procedures.

As explained below, the Court will **GRANT** summary judgment to ICE with respect to its withholdings of names, docket numbers, attempts to locate non-citizens, and apprehension locations contained in the cumulative spreadsheet report, and will **GRANT** summary judgment to AFLF with respect to ICE's *wholesale* withholdings of month and years of birth; city, state, and country information of residential addresses; gang, cartel, and terrorist group information; and monikers. Because the permissibility of ICE's withholdings is presented in the abstract without any individual-specific information, however, the Court will permit ICE to withhold any such information in the latter category if, and only if, it can demonstrate that the *specific* withheld information would effectively identify the particular individual at issue or reveal ICE's law enforcement techniques or procedures.

2

## I.  BACKGROUND

In early 2021, ICE's Acting Director, Tae Johnson, issued an "interim guidance" memorandum to all ICE employees setting forth the agency's "priorities" for its "enforcement and removal" operations.  Dkt. 1-2 ("Interim Guidance").  The Interim Guidance designated three priority groups of non-citizens for removal: (1) individuals who posed threats to national security, (2) individuals who unlawfully entered the United States (or attempted to do so) after November 1, 2020, and (3) individuals who "pose[d] a threat to public safety."  *Id.* at 5–6.  The Interim Guidance explained that "[e]nforcement and removal actions" against individuals that fell into one or more of these categories "are presumed to be a justified allocation of ICE's limited resources."  *Id.* at 4.  If a non-citizen did not fall into one of the three "presumed priority" categories, ICE officers needed to obtain "preapproval" for any enforcement action against them, absent exigent circumstances.  *Id.* at 6.  As ICE has explained, the purpose of this approach was to ensure that the agency's scarce resources were used devoted to the highest priority cases.

The Interim Guidance also created weekly "reporting requirements on all enforcement and removal actions."  Dkt. 26-2 at 5 (Pineiro Decl. ¶ 14).  In particular, "[e]ach Friday," ICE directors would "compile and provide" to ICE leadership a "written report:  (1) identifying each enforcement action [or removal] taken in the prior week, including the applicable priority criterion, if any; (2) providing a narrative justification of the action; and (3) identifying the date, time, and location of the action."  Dkt. 1-2 at 8.  The purpose of these reports was to allow ICE leadership to assess the "effectiveness" of the enforcement priorities set forth in the Interim Guidance.  *Id.*

Several months later, AFLF submitted a FOIA request to ICE seeking all weekly "written reports" referenced in the Interim Guidance.  Dkt. 26-2 at 2 (Pineiro Decl. ¶ 8).  ICE ultimately

located a cumulative spreadsheet ("Spreadsheet Report") containing "all of the non-citizens in the prior reports." *Id.* at 4 (Pineiro Decl. ¶ 11).  The Spreadsheet Report contains two tabs.  The first, titled "All-Priorities," contains 48 columns of information regarding non-citizens for whom "enforcement and removal actions have been approved." *Id.* at 6 (Pineiro Decl. ¶¶ 16–17).  The columns contain extensive data about each non-citizen, including the non-citizen's "name, date of birth[,] age, Alien Number (A-Number), . . . complete criminal histories, including uncharged, dismissed, pending and misdemeanor cases; complete immigration histories, including visa information, arrival and entrance information, . . . health information[;] the existence of United States Citizen (USC) relatives; outstanding warrant information; residential address information, and criminal organization affiliation." *Id.* at 5–6 (Pineiro Decl. ¶ 15).  It also sets forth "removal priority" of each non-citizen, enforcement actions already taken, the "basis" for those actions, and, if enforcement or removal has yet to occur, "where" and "when" an enforcement action "may potentially take place." *Id.* at 6–9, 7& nn.8–9 (Pineiro Decl. ¶¶ 16–23).  The second tab, titled "Denials," "pertains to non-citizens for wh[om] the requested enforcement and removal action was denied at the time of the request." *Id.* at 10 (Pineiro Decl. ¶ 24).  "In addition to the 48 columns contained in the All-Priorities Tab, the Denials Tab contains information pertaining to those denials," such as the date and the reason for the denial.  *Id.*

AFLF submitted its FOIA request in May 2021 and commenced this litigation two months later, before ICE provided a final response to AFLF's request.  *Id.*at 3–4 (Pineiro Decl. ¶¶ 9–10).  ICE began producing the Spreadsheet Report (the first tab of which contains over 57,000 rows and forty-eight columns of information) at a rate of 2,000 rows per month.  Dkt. 29 at 9; Dkt. 26-1 at 11.  ICE redacted certain categories of information, however, pursuant to FOIA Exemptions 6, 7(C), or 7(E).  AFLF maintains that these redactions were improper, and it

requested that the Court set an early schedule for summary judgment briefing on the following

categories (or columns) of withholdings:  "(1) court case numbers; (2) gang, cartel, and terrorist

group information; (3) names and monikers; (4) month and year from dates of birth; (5) city,

state, and country from residential addresses; and (6) apprehension locations."  Dkt. 29 at 9.  The

parties' cross-motions for summary judgment are now before the Court.  Dkts. 26-1; 29.

## II.  LEGAL STANDARD

The Freedom of Information Act is premised on the notion that an "informed citizenry" is

"vital to the functioning of a democratic society" and "needed to check against corruption and to

hold the governors accountable to the governed."  *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S.

214, 242 (1978).  The Act embodies a "general philosophy of full agency disclosure."  *U.S.*

*Dep't of Def. v. Fed. Lab. Rels. Auth.*, 510 U.S. 487, 494 (1994) (quoting *Dep't of Air Force v.*

*Rose*, 425 U.S. 352, 360–61 (1976)).  It thus mandates that an agency disclose records on

request, unless they fall within one of nine exemptions.  "These exemptions are 'explicitly made

exclusive' and must be 'narrowly construed.'"  *Milner v. Dep't of Navy*, 562 U.S. 562, 565

(2011) (quoting *EPA v. Mink*, 410 U.S. 73, 79 (1973), and *FBI v. Abramson*, 456 U.S. 615, 630

(1982)).  As explained further below, the present dispute turns on the scope and application of

Exemptions 6 and 7(C).  Both of those exemptions "seek to protect the privacy of individuals

identified in certain agency records."  *ACLU  v. U.S. Dep't of Just.*, 655 F.3d 1, 6 (D.C. Cir.

2011).  Exemption 6 extends to "personnel and medical files and similar files," 5 U.S.C.

§ 552(b)(6), while Exemption 7(C) applies to "records or information compiled for law

enforcement purposes," *id.* § 552(b)(7)(C).  In addition, AFLF challenges ICE's withholding of

certain information pursuant to FOIA Exemption 7(E).  That exemption applies to records

compiled for law enforcement purposes that reflect techniques or procedures for law

enforcement investigations or prosecutions or guidelines for law enforcement investigations or prosecutions, where disclosure could reasonably be expected to risk circumvention of the law. *Id.* § 552(b)(7)(E).

FOIA cases are typically resolved on motions for summary judgment under Federal Rule of Civil Procedure 56. *See, e.g.*, *Beltranena v. U.S. Dep't of State*, 821 F. Supp. 2d 167, 175 (D.D.C. 2011). To prevail on a summary judgment motion, the moving party must demonstrate that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In a FOIA action, the agency may meet its burden by submitting "relatively detailed and non-conclusory" affidavits or declarations, *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quotation marks and citation omitted), and an index of the information withheld, which is commonly known as a "*Vaughn* index," *see Vaughn v. Rosen*, 484 F.2d 820, 827–28 (D.C. Cir. 1973). An agency "is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced . . . or is wholly exempt from the [FOIA's] inspection requirements.'" *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) (quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978)). The Court reviews the agency's decision *de novo*, and the agency bears the burden of sustaining its action. 5 U.S.C. § 552(a)(4)(B).

## III.  ANALYSIS

ICE withheld non-citizens' names; court docket numbers; dates of birth; residential addresses; gang, cartel, and terrorist group affiliation; and monikers pursuant to FOIA Exemptions 6 and 7(C). Dkt. 26-1 at 20–33. Both exemptions protect personal privacy, but they differ in scope. Exemption 6 shields "personnel and medical files and similar files the disclosure

of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C.

§ 552(b)(6). "[T]he mere fact that an agency file or record contains personal, identifying

information," however, "is not enough to invoke Exemption 6;" in addition, the information must

be "'of such a nature that its disclosure would constitute a clearly unwarranted privacy

invasion.'" *Jud. Watch, Inc. v. U.S. Dep't of State*, 282 F. Supp. 3d 36, 49–50 (D.D.C. 2017)

(quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002)).

Exemption 7(C), in contrast, applies only to records or information "compiled for law

enforcement purposes," and it offers more robust protection for those records. *See Tracy v. U.S.

Dep't of Just.*, 191 F. Supp. 3d 83, 95 (D.D.C. 2016). While Exemption 6 is limited to records

"the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," 5

U.S.C. § 552(b)(6), "[t]he adverb 'clearly' . . . is not used in Exemption 7(C)," *Nat'l Archives &

Recs. Admin. v. Favish*, 541 U.S. 157, 165–66 (2004). Moreover, while "Exemption 6 refers to

disclosures that 'would constitute' an invasion of privacy, Exemption 7(C) encompasses any

disclosure that 'could reasonably be expected to constitute' such an invasion." *U.S Dep't of Just.

v. Reps. Comm. For Freedom of the Press*, 489 U.S. 749, 756 (1989).

ICE argues that the Spreadsheet Report was compiled for law enforcement purposes and

thus falls within the scope of Exemption 7(C), and that, because Exemption 7(C) "is more

protective of privacy" than Exemption 6, the Court need consider only whether the agency

properly invoked Exemption 7(C). Dkt. 26-1 at 33. As explained below, the Court agrees. *See

ACLU*, 655 F.3d at 6. And, applying Exemption 7(C), the Court further concludes that ICE

permissibly invoked the exemption with respect to non-citizens' names and docket numbers, but

that it improperly invoked the exemption with respect to its *wholesale* redactions of the month

7

and year of non-citizens' dates of birth; the city, state, and country of their residence; their gang, cartel, and terrorist affiliation; and their monikers.

## A.    Compiled for Law Enforcement Purposes

"To fall within Exemption 7, documents must first meet a threshold requirement:  that the records were 'compiled for law enforcement purposes.'"  *Pub. Emps. for Envt'l Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico* ("*PEER*"), 740 F.3d 195, 202–03 (D.C. Cir. 2014) (quoting 5 U.S.C. § 552(b)(7)).  To show that the Spreadsheet Report was "compiled for law enforcement purposes," ICE "need only 'establish a rational nexus between [the withholding] and one of the agency's law enforcement duties," as well as a "connection between an individual or incident and a possible . . . violation of federal law.'"  *Blackwell v. FBI*, 646 F.3d 37, 40 (D.C. Cir. 2011) (quoting *Campbell v. Dep't of Just*, 164 F.3d 20, 32 (D.C. Cir. 1998)).

In considering this issue, "it is not the nature of the agency that controls, but the character of the records withheld."  *Elkins v. Fed. Aviation Admin.*, 99 F. Supp. 3d 90, 98 (D.D.C. 2015).  Nonetheless, as ICE notes, and as AFLF does not dispute, ICE's "principal function is law enforcement," and so its invocation of Exemption 7 for the Spreadsheet Report is entitled to deference.  *PEER*, 740 F.3d at 203 (quoting *Tax Analysts v. IRS*, 294 F.3d 71, 77 (D.C. Cir. 2002)); *see* Dkt. 26-1 at 15–17; Dkt. 29 at 13–15; Dkt. 26-2 at 20–21 (Pineiro Decl. ¶¶ 59–61) (explaining that ICE "upholds U.S. immigration law at, within, and beyond our borders," and "manages all aspects of the immigration enforcement process").

Applying these standards, the Court has no difficulty concluding that the Spreadsheet Report was compiled for law enforcement purposes.  The Spreadsheet Report is a comprehensive record of information detailing ICE's enforcement and removal actions, Dkt. 26-2 at 4–5

(Pineiro Decl. ¶¶ 11–15), and, accordingly, shares an obvious "nexus" with ICE's "law enforcement duties," *Blackwell*, 646 F.3d at 40; *accord Shapiro v. U.S. Dep't of Just.*, 239 F. Supp. 3d 100, 117 (D.D.C. 2017) (holding that records that "incorporate information compiled in the course of enforcing" the law were "compiled for law enforcement purposes").  The Spreadsheet Report shows ICE "investigating and prosecuting" violations, *PEER*, 740 F.3d at 203, and reveals, among other things, which individuals ICE believes should be subject to enforcement; where, when, and why ICE has taken enforcement action against these individuals; and, in cases in which ICE has not yet acted, enforcement steps it plans to take, Dkt. 26-2 at 5 (Pineiro Decl. ¶ 14).  Moreover, as the Interim Guidance explains, the purpose of collecting these data was to allow ICE leadership to monitor enforcement actions and to ensure the "effectiveness" of ICE's prioritization scheme.  Dkt. 1-2 at 8; *see Sack v. U.S. Dep't of Def.*, 823 F.3d 687, 694 (D.C. Cir. 2016) (holding that reports that help law enforcement assess the efficacy of polygraph examinations are "compiled for law enforcement purposes").  By any measure, the Spreadsheet Report qualifies for Exemption 7.[1]

    None of AFLF's arguments to the contrary is persuasive.  AFLF contends that the Pineiro Declaration is too vague and conclusory to satisfy ICE's burden under Exemption 7.  Dkt. 29 at 13.  The Court disagrees.  The Pineiro Declaration explains that the data collection, weekly reporting, and preapproval process (all of which ultimately comprised the Spreadsheet Report) related to ICE's efforts to implement and to monitor the efficacy of its law enforcement priorities.  Dkt. 26-2 at 5 (Pineiro Decl. ¶ 14).  AFLF also argues that Exemption 7 does not

---

[1] ICE does not fully explain how or why it created the Spreadsheet Report, as distinguished from the individual reports upon which it is based.  *See* Dkt. 26-2 at 4 (Pineiro Decl. ¶ 11).  In any event, the parties do not rely on this distinction, and Exemption 7 nonetheless applies to records that "contain[ ] or essentially reproduce[ ] all or part of a record that was previously compiled for law enforcement reasons."  *Abramson*, 456 U.S. at 624.

apply because "the true purpose behind these records [was] political," not "law enforcement." Dkt. 29 at 15. Even assuming AFLF has drawn a meaningful or administrable distinction, the Court concludes that the Spreadsheet Report easily falls on the "law enforcement" side of AFLF's line because the record serves a "legitimate law enforcement purpose." *Id.* (citing *Rosenfeld v. FBI*, 2011 WL 13269173, at *4 (N.D. Cal. Feb. 23, 2011) (holding that Exemption 7 did not apply to "political favors to Reagan [that] serve[d] no legitimate law enforcement purpose")).

For these reasons, the Court concludes that the Spreadsheet Report was compiled for ICE's law enforcement purposes.

**B.      Balance of Interests Under Exemption 7(C)**

The second question posed by Exemption 7(C) is whether disclosure of the information "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). In resolving that question, the Court "must balance the public interest in disclosure against the [privacy] interest[s] Congress intended the Exemption to protect." *Reps. Comm. For Freedom of the Press*, 489 U.S. at 776.

At the outset, however, the parties dispute whether FOIA's privacy protections apply to non-citizens. Dkt. 29 at 10. AFLF contends that "FOIA's privacy protections only apply when a 'citizen' is identified in the records," and so the Court need not engage in any balancing with respect to non-citizens' information contained in the Spreadsheet Report. *Id.* On AFLF's view, this interpretation is consistent with FOIA's "general policy of disclosure" and "how U.S. law broadly distinguishes between citizens and noncitizens." *Id.* at 12.

The Court is unpersuaded. As ICE notes, the text of FOIA protects "personal privacy"— it does not distinguish between citizens and non-citizens. 5 U.S.C. § 552(b)(6) & (7)(C); *cf.*

Person, Black's Law Dictionary (12th ed. 2024) (defining "person" as "[a] human being").  Nor does AFLF cite any authority for the proposition that non-citizens lack cognizable privacy interests under FOIA, and Supreme Court precedent indicates otherwise.  In *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982), the Court applied FOIA's prohibition on "unwarranted invasion of personal privacy" to Iranian nationals.  Similarly, in *U.S. Dep't of State v. Ray*, 502 U.S. 164, 166, 178 (1991), the Court concluded that FOIA's privacy protections applied to "Haitian nationals who had attempted to emigrate illegally to the United States and were involuntarily returned to Haiti."  *See also Tuffly v. U.S. Dep't of Homeland Sec.*, 870 F.3d 1086, 1091 (9th Cir. 2017) (applying Exemption 7 to protect non-citizens' personal information); *Graff v. FBI*, 822 F. Supp. 2d 23, 34 (D.D.C. 2011) ("[F]oreign nationals are entitled to the privacy protections embodied in FOIA.") (citing cases).

AFLF, in effect, would have the Court apply a presumption that federal statutes do not apply to non-citizens unless the text says otherwise.  But, if anything, courts apply the opposite presumption, because when Congress wants to distinguish between citizens and non-citizens, it does so explicitly.  Non-citizens, for example, are expressly prohibited from voting in federal elections, 18 U.S.C. § 611, yet both citizens and non-citizens enjoy the protection of federal criminal laws, may generally bring suit in federal court, and are entitled to protection under an array of federal statutes that apply in civil cases.  Indeed, non-citizens are permitted to bring suit under FOIA itself.  *See*, *e.g*., *Emuwa v. U.S. Dep't of Homeland Sec.*, 113 F.4th 1009 (D.C. Cir. 2024); *Hussain v. U.S. Dep't of Homeland Sec.*, 674 F. Supp. 2d 260, 262 (D.D.C. 2009).  Lest there be any doubt, AFLF's interpretation of FOIA would mean that millions of lawful permanent residents' private health, residential, demographic, or contact information could be disclosed to the public at large as the result of a single FOIA request.  Because the statute

provides no indication that Congress intended that result—but, rather, provides broad protection for "personal privacy"—the Court concludes that FOIA's privacy protections apply to the individuals identified in the Spreadsheet Report.

Accordingly, the Court will balance the individuals' privacy interest in each category of disputed information against the public interest in disclosure. In doing so, the Court notes that "[t]he concept of personal privacy under Exemption 7(C) is not some limited or 'cramped notion' of that idea." *Favish*, 541 U.S. at 165. A disclosure implicates privacy interests if it affects "the individual's control of information concerning his or her person," or involves the "disclosure of records containing personal details." *Reps. Comm. For Freedom of the Press*, 489 U.S. at 763, 766. In particular, the Court must consider "the consequences that would follow" from disclosure. *Favish*, 541 U.S. at 170. Oftentimes, "[d]isclosure does not, literally by itself, constitute a harm; it is the requester's (or another's) reaction to the disclosure," as well as the context of the disclosure, "that can sting." *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 878 (D.C. Cir. 1989). For example, the disclosure of "a list of names" is not "inherently and always a significant threat to the privacy of the individuals on the list." *Ray*, 502 U.S. at 177 n.12. But such disclosure becomes problematic when a name can be "linked" to other "highly personal information," such as "marital and employment status, children, living conditions and attempts to enter the United States." *Id.* at 175. "Although disclosure of such personal information constitutes only a *de minimis* invasion of privacy *when the identities of the [individuals] are unknown*, the invasion of privacy becomes significant *when the personal information is linked to particular [individual]*." *Id.* at 176 (emphasis added). "Disclosures that would subject individuals to possible embarrassment, harassment, or the risk of mistreatment

constitute nontrivial intrusions into privacy." *Tuffly*, 870 F.3d at 1093; *accord Ray*, 502 U.S. at 175 n.12.

On the other side of the Exemption 7(C) scale, the FOIA requester "bears the burden of showing (1) that 'the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake,'" and (2) that "the information [it] seeks 'is likely to advance that interest.'" *Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1174–75 (D.C. Cir. 2011) (quoting *Favish*, 541 U.S. at 172). The relevant inquiry under the "FOIA balancing analysis is the extent to which disclosure of the information sought would she[d] light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *Bibles v. Or. Nat. Desert Ass'n*, 519 U.S. 355, 355–56 (1997) (per curiam) (internal quotation marks omitted).

1.    *Names*

It is well-established that individuals have a privacy interest in not being publicly associated with law enforcement efforts, even where they are the targets of those efforts. *See Computer Pros for Soc. Resp. v. U.S. Secret Serv.*, 72 F.3d 897, 904 (D.C. Cir. 1996) ("Exemption 7(C) takes particular note of the strong interest of . . . suspects . . . in not being associated unwarrantedly with alleged criminal activity."); *Laborers' Int'l. Union of N. Am. v. U.S. Dep't of Just.*, 772 F.2d 919, 920 (D.C. Cir. 1984) (withholding report under 7(C) containing "the names of numerous individuals and [documenting] alleged illegal activities of several of these individuals"). This privacy interest extends to "convictions and public pleas," *ACLU*, 655 F.3d at 8, as well as "the compilation of otherwise hard-to-obtain information" regarding an individual's criminal history, *Reps. Comm. For Freedom of the Press*, 489 U.S. at 764. The interest "becomes significant" in cases where the release of someone's name is

accompanied by a release of other pieces information, such that named individuals could be "linked" to their "highly personal information." *Ray*, 502 U.S. at 175–76 (1991).

In this case, releasing the names of individuals in the Spreadsheet Report would implicate significant privacy concerns. Release of that information would identify non-citizens who are subject to removal from the United States. As other courts have recognized, "undocumented immigrants face a serious risk of 'harassment, embarrassment, and even physical violence and reprisal by citizens and law enforcement.'" *Tuffly*, 870 F.3d at 1096 (quoting district court opinion); *cf. Ray*, 502 U.S. at 175 n.12 (concluding that release of returnees' names "would be a significant invasion of their privacy because it would subject them to possible embarrassment and retaliatory action" in Haiti). But even putting that risk aside, releasing the names included in the Spreadsheet Report would permit the public to connect the other information that ICE has released without redactions to specific individuals. This includes "highly personal information," *Ray*, 502 U.S. at 175, such as their "immigration status, immigration histories, visa information, DACA and employment authorization information, citizenship, ethnicity, criminal histories" (including "pending and uncharged conduct"), "health information and immigration enforcement activities against the non-citizens, as well as information on family members and associates of the non-citizens." Dkt 26-2 at 32 (Pineiro Decl. ¶ 101). Permitting members of the public to associate a particular individual with this information would result in a "significant invasion[ ] of personal privacy." *Ctr. for Investigative Reporting v. U.S. Immigr. & Customs Enf't*, 2019 WL 6498817, at *5 (D.D.C. Dec. 3, 2019) (quoting *Tuffly*, 870 F.3d at 1098).

AFLF suggests that these individuals have diminished privacy interests in their names because they are not "third parties" incidentally named in a law enforcement file—they are the subjects of the enforcement actions. AFLF further maintains that "many have been convicted of

14

heinous crimes[] and [that] their privacy interests (if any) are substantially diminished." Dkt. 29 at 28. The problem with this argument is that this interest—however weak it may be—is only the tip of the iceberg here. Although individuals have weakened privacy interests in their public "conviction[s] or plea[s]," *ACLU*, 655 F.3d at 8, the D.C. Circuit has recognized that "the scope of Exemption 7(C) can extend even to convictions and public pleas," *id.* But, in any event, the Spreadsheet Report implicates much more than that. The information in the Spreadsheet Report is not limited to identifying non-citizens who have public convictions or pleas, nor to non-citizens who were "approved" for ICE enforcement actions (which, presumably, remains confidential until implemented). As explained above, disclosure of names would "link[]" particular individuals to a trove of highly personal data, not just public proceedings brought against them. *Ray*, 502 U.S. at 176.

*Union Leader Corp. v. U.S. Dep't of Homeland Sec.*, 749 F.3d 45, 56 (1st Cir. 2014)— the case upon which AFLF principally relies—illustrates this point. In that case, the plaintiff submitted a FOIA request to ICE for "the names . . . [of] six individuals arrested in New Hampshire" as part of a nationwide ICE enforcement operation. *Id.* at 48–49. The First Circuit ordered ICE to release the names, reasoning that this was a "narrow[]" request, *id.* at 49, and the arrestees' privacy interest was "attenuated" by the "public record" of their arrests and convictions, *id.* at 56. In contrast to this case, the disclosure of those names in the *Union Leader* case was not accompanied by the disclosure of the type of detailed and extensive personal data included in the Spreadsheet Report.

As a result, the disclosures that AFLF seeks is more closely akin to the disclosure the Supreme Court rejected in *Reporters Committee*, 489 U.S. at 780, although the privacy interests at stake here are, if anything, stronger than in *Reporters Committee*. In that case, the Court

sustained the agency's decision to withhold individuals' FBI "rap sheets," which "revealed the subjects' 'date of birth and physical characteristics, as well as a history of arrests, charges, convictions, and incarcerations' in every jurisdiction in the country." *ACLU*, 655 F.3d at 8 (quoting *Reps. Comm. For Freedom of the Press*, 489 U.S. at 752). The Court held "as a categorical matter" that "a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy," even where they are the subject of the investigation, and especially where those records would reveal other highly personal information. *Reps. Comm.*, 489 U.S. at 780.

Having concluded that release of the names contained in the Spreadsheet Report implicates a cognizable privacy interest, the Court must balance that interest against the public interest in disclosure. On AFLF's telling, the public has a strong interest in knowing the names of those identified in the Spreadsheet Report so it can "determine if the same person appears multiple times in the records, confirming that the same individual is repeatedly subject to removal actions." Dkt. 29 at 26. But as ICE explains, the Spreadsheet Report contains this information. *E.g.*, Dkt. 26-3 at 5 (*Vaughn* Index) ("Basis for ICE Enforcement Action: Subject previous voluntarily removed by Border Patrol via Nogales, Arizona on or about 08/21/2006 and 08/25/2006."); *id.* at 10 (explaining that non-citizen had twice before been removed to El Salvador). AFLF also asserts that knowing the non-citizens' names would allow the public to "review other material about [them]." Dkt. 33 at 19. Yet AFLF does not explain what "material" the public has an interest in reviewing that is not already captured by the Spreadsheet Report, nor how reviewing such material would help the public assess ICE's operations. *See id.*

The Court therefore concludes that the public interest is outweighed by the unwarranted invasion of privacy that would be caused by releasing the names in the Spreadsheet Report, and

will, accordingly, grant ICE's motion for summary judgment and deny AFLF's motion for summary judgment with respect to release of these names.

2.    *Docket Numbers*

The parties next dispute whether ICE properly withheld docket numbers from the narrative portions of the Spreadsheet Report.  Relying on this Court's decision in *Brennan Ctr. for Just. at N.Y.U. Sch. of L. v. U.S. Dep't of Just.*, 2021 WL 2711765 (D.D.C. July 1, 2021), AFLF argues that the non-citizens have "*de minimis*" privacy interest in docket numbers of cases resulting in convictions and that the Court should order release of docket numbers of cases resulting in acquittals because, unlike *Brennan Center*, there is no risk of associating acquitted individuals with any particular "stigmatic" charge, such as terrorism.  Dkt. 29 at 18–20.

In response, ICE explains that "[t]he derivative use of court case numbers, of course, is to identify the noncitizens who appear in the Spreadsheet Report."  Dkt. 26-1 at 25.  The Court agrees that disclosing the docket numbers would simply circumvent the Court's decision upholding the agency's decision to redact the names of those identified in the Spreadsheet Report.  After all, "it would take little work for an interested person to use the docket information" to locate the underlying case files and "identify" the non-citizens.  *ACLU*, 655 F.3d at 7–8.  AFLF appears to concede as much, arguing that docket numbers should be disclosed because obtaining non-citizens' "names" would enable it to assess their criminal history and "ICE's performance of its duties."  Dkt. 29 at 17.

To be sure, "an agency's disclosure of public docket numbers for cases that resulted in convictions implicates" a substantially weaker privacy interest "[b]ecause the conviction or plea is already public."  *Brennan Center*, 2021 WL 2711765, at *3 (quoting *Brennan Center for Justice at N.Y.U. Sch. of L. v. U.S. Dep't of Just.*, 2020 WL 118091, at *6).  But as explained

above, disclosing the docket numbers would, in effect, release much more than a public conviction, plea, and underlying court filings. An interested person armed with a docket number could link a particular individual to all the other information contained in the Spreadsheet Report that ICE has already released. Dkt 26-2 at 32 (Pineiro Decl. ¶ 101). The Court is persuaded that, in this context, release of the docket numbers would constitute an unwarranted invasion of personal privacy.

On the other side of the balance, AFLF insists that the public interest in the docket numbers is high "because those numbers will allow the public to consider the criminal histories of those aliens who ICE officers sought to remove but were required first to receive political approval." Dkt. 29 at 17. As AFLF acknowledges, however, ICE fully released the "Criminal History" column of the Spreadsheet Report, Dkt. 26-2 at 10 (Pineiro Decl. ¶ 26), which sets forth "complete criminal histories, including uncharged, dismissed, pending and misdemeanor cases," *id.* at 5 (Pineiro Decl. ¶ 15); *see, e.g.*, Dkt. 26-3 at 157 (*Vaughn* Index) (detailing criminal history including court, offense, sentence, and probation violations, among other facts). AFLF nonetheless maintain that this information "will not . . . satisf[y]" public interest in the docket numbers because the public should be able to "evaluat[e] the information contained in a whole trial." Dkt. 29 at 18.[2] The public interest that exists in "evaluating . . . whole trial[s]" in order to evaluate ICE's operations, *id.*, is at least one step removed from the public interest in understanding how ICE operates; the relevant question for purposes of understanding *ICE*'s operation is what data and information *ICE* has before it and not what occurred before a trial

---

[2] Plaintiff also argues that the criminal histories ICE has provided are insufficient because they do not include "uncharged conduct." Dkt. 29 at 18. But as the Pineiro Declaration explains, the criminal histories do include uncharged conduct where applicable. Dkt. 26-2 at 5 (Pineiro Decl. ¶ 15).

court.  But, in any event, the interest in connecting ICE's operations to "whole trial[s]" occurring

in state or federal court is outweighed by the privacy interests described above.  *Id.*

The Court will, accordingly, grant ICE's motion for summary judgment and deny

AFLF's cross-motion for summary judgment with agency's withholding of the docket numbers.

3.    *Dates of Birth*

AFLF also challenge ICE's "withholding of full dates of birth."  Dkt. 29 at 29.  In

pressing this argument, AFLF appears to concede that disclosure of each individual's day,

month, and year of birth would implicate the same privacy interests discussed above, *id.* (relying

on *American Immigration Council v. U.S. Immigration & Custom Enforcement*, 464 F. Supp. 3d

228, 239 (D.D.C. 2020), and arguing that individuals have minimal, if any, privacy interest in the

month and year of their birth), and the Court is persuaded that release of that detailed

information, along with other information in the Spreadsheet Report, would be tantamount to

releasing the names of those listed in the Spreadsheet Report.  But AFLF makes a more modest

request—it seeks disclosure of the month and year of each non-citizens' birthdates, arguing that

"ICE cannot identify any privacy interest" in those pieces of information.  Dkt. 33 at 22.  ICE

responds that non-citizens do retain a privacy interest in the month and year of their birth, and, in

any event, "[t]here is no public interest in releasing this information because ICE has fully

informed the public about its law enforcement operations by releasing noncitizens' ages."  Dkt.

32 at 21–22 (citing Dkt. 26-2 at 10 (Pineiro Decl. ¶ 26)).

The withholding agency bears the burden of demonstrating that that "there is any privacy

interest at stake."  *ACLU*, 655 F.3d at 6.  Until it does so, moreover, there is no need to consider

the other side of the balance—that is, whether there is a significant public interest in disclosure.

*Id.* at 12.  Here, ICE has failed to offer sufficient basis for the Court to conclude that there is a

freestanding privacy interest in one's month and year of birth when it is not linked to a particular individual, nor does ICE argue that it plausibly could be used to identify individuals in the Spreadsheet Report. The Court can imagine circumstances in which disclosure of a person's month and year of birth (along with other information) could be used to identify them, but ICE does not point to any evidence or examples of this in the Spreadsheet Report. Indeed, ICE has already released the non-citizens' ages, presumably because it believed that that information would not allow an observer to discern the non-citizens' identities.

The Court is unpersuaded, moreover, that the fact that ICE has already provided non-citizens' ages relieves it of its obligation to disclose the month and year of non-citizens' birth dates. An agency may not avoid the statute's mandate to segregate and disclose exempt portions of the record by claiming that the requested information is redundant. 5 U.S.C. § 552(b); *see Abramson*, 456 U.S. at 630 (explaining that "FOIA exemptions are to be narrowly construed" because "the basic policy of the Act is in favor of disclosure").

The Court will, accordingly, grant summary judgment in favor of ICE with respect to the full dates of birth, will deny ICE's motion for summary judgment with respect to the month and year of birth, and will grant AFLF's cross-motion for summary judgment with respect to the agency's *wholesale* redaction of all listed months and years of birth. But, in an exceptional case, if ICE concludes that such a withholding is warranted because it would effectively identify a particular individual, ICE may redact that information, so long as it supports its determination with a declaration or *Vaughn* index explaining why on a case-by-case basis. *See* 5 U.S.C. § 552(b) (requiring agencies to "segregate and release nonexempt information"); *Kwoka v. Internal Revenue Serv.*, 2018 WL 4681000, at *4 (D.D.C. Sept. 28, 2018).

4.      *City, State, and Country Information of Residential Addresses*

The parties next dispute whether ICE properly redacted non-citizens' residential addresses, which appear in some of the narrative portions of the Spreadsheet Report.  Dkt. 26-3 at 222–24 (*Vaughn* Index).  Sensibly, AFLF does not seek non-citizens' full addresses, but only the city, state, and country information.  Dkt. 29 at 30.  The Court agrees with AFLF that, at least in most circumstances, disclosure of this information would not constitute an unwarranted intrusion on non-citizens' privacy.  ICE does not explain how disclosure of this information could be used to identify particular non-citizens.  *See* Dkt. 32 at 24.  Thus, because "the identities of the [non-citizens] [would be] unknown," disclosure "constitutes only a *de minimis* invasion of privacy."  *Ray*, 502 U.S. at 176.

In light of ICE's failure to demonstrate a privacy interest in this information, at least in general, the Court will deny ICE's motion for summary judgment and will grant AFLF's cross-motion with respect to the *wholesale* redaction of city, state, and country information.  But as with non-citizens' months and years of birth, ICE may redact this information on a case-by-case basis.  To the extent disclosure of this information might, in a particular case and when considered along with other information that ICE has released, effectively identify an individual, ICE may withhold that specific information upon making a proper showing.

5.      *Gang, Cartel, Terrorist Group Affiliation, and Monikers*

ICE also redacted "non-citizens' affiliations with gangs, terrorist groups and cartels" and non-citizens' "monikers" pursuant to Exemption 7(C).  Dkt. 26-2 at 12 (Pineiro Decl. ¶ 31).  ICE contends that, just as criminals maintain some privacy interest in their criminal histories or "rap sheets," non-citizens maintain a similar privacy interest in their affiliation with criminal organizations.  *See* Dkt. 32 at 23 (citing *Reps Comm.*, 489 U.S. at 753, 771).  ICE further insists

that "release of [this information] in conjunction with the compilation of other information included in the Spreadsheet Report could be used to identify the non-citizens at issue."  Dkt. 26-2 at 28 (Pineiro Decl. ¶ 87).  As for monikers in particular, ICE reasons that they "function in a similar fashion to names," Dkt. 26-1 at 32, and "could also be used to identify the non-citizen at issue, at least by the population familiar with the moniker if not the broader public," Dkt. 26-2 at 24 (Pineiro Decl. ¶ 73).

In general, the Court disagrees.  Even assuming the privacy interest in one's "rap sheet" is sufficiently analogous to one's gang, cartel, and terrorist group affiliation, that privacy interest is implicated only when it is accompanied by identifying information.  *See Reps. Comm.*, 489 U.S. at 763–65.  As the Supreme Court explained in *Ray*, even the disclosure of highly personal information will generally not constitute an unwarranted invasion of privacy where that information cannot be linked to an individual.  *Ray*, 502 U.S. at 176; *see Dep't of Air Force v. Rose*, 425 U.S. 352, 373–77 (1976) (holding that disciplinary case summaries containing sensitive information were disclosable with identifying names redacted).  The problem here is that ICE does not explain how anyone could identify an individual non-citizen if it were to release this information.  The Pineiro Declaration contains no specific details on this score, simply asserting that this criminal organization affiliation "could" reveal non-citizens' identities. Dkt. 26-2 at 28 (Pineiro Decl. ¶ 87).  The same is true for non-citizens' monikers:  ICE cites no authority for the proposition that individuals have a privacy interest in monikers, *see* Dkt. 26-1 at 33, and it makes only a conclusory assertion that they "could" be used in to identify particular citizens, Dkt. 26-2 at 24 (Pineiro Decl. ¶ 73).  Although an agency's declarations are entitled to a presumption of good faith, they must nonetheless advance justifications that "appear[] logical or

22

plausible." *Larson v. Dep't of State*, 565 F.3d 857, 862, 865 (D.C. Cir. 2009) (internal quotation marks and citation omitted).

That said, the Court's consideration of whether a gang affiliation or moniker might implicate significant privacy interests is limited because the issue is presented in the abstract, without the benefit of examples or particular circumstances that might permit an observer to identify a specific individual based on the disclosure. A hypothetical "gang," for example, might have only a dozen members. Or a particular moniker might have sufficient public salience that disclosing it would be no different from disclosing the person's name. It is common knowledge who Ike, Honest Abe, the Iron Lady, El Chapo, Smokin' Joe, J. Lo, Dr. J, Buffalo Bill, Flo Jo, and the Desert Fox were. Here, of course, it is far less likely that a moniker will carry public import, but there remains the possibility that a moniker will, in a particular instance, permit the public to discern whose personal information is otherwise disclosed in the Spreadsheet Report.

Nonetheless, "the existence of a few possible exceptions does not justify [ICE's] blanket withholding here." *Kwoka*, 2018 WL 4681000, at *4. The Court will, accordingly, deny ICE's motion for summary judgment with respect to the withholding of monikers and gang, cartel, and terrorist group affiliations, and will grant AFLF's cross-motion with respect to ICE's *wholesale* redaction of this information from the Spreadsheet Report. To the extent ICE concludes that a particular disclosure would identify a specific individual, "it can redact those portions, but it must justify its redactions 'with reasonably specific detail.'" *Id.* (quoting *Mil. Audit Proj. v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)).

**D.    Exemption 7(E)**

In addition to Exemption 7(C), ICE invokes Exemption 7(E) to withhold residential addresses; apprehension locations; gang, cartel, terrorist group affiliation; and monikers.

Under Exemption 7(E), an agency may withhold:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

5 U.S.C. § 552(b)(7)(E). Although not the most natural reading of the statutory text (or, more precisely, the statutory sentence structure), the D.C. Circuit has held that the risk-of-circumvention requirement applies both (1) to techniques and procedures for law enforcement investigations or prosecutions and (2) to guidelines for law enforcement investigations or prosecutions. *See PEER*, 740 F.3d at 204 n.4; *but cf. Allard K. Lowenstein Int'l Human Rights Proj. v. Dep't of Homeland Security*, 626 F.3d 678, 681–82 (2d Cir. 2010) (holding that the risk-of-circumvention requirement applies only to records containing guidelines). But the D.C. Circuit has also construed the risk-of-circumvention requirement to set "a relatively low bar for the agency to justify withholding: 'Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law.'" *Blackwell*, 646 F.3d at 42 (quoting *Mayer Brown, LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009)).

The term "law enforcement" includes the enforcement of both civil and criminal statutes and regulations. *PEER*, 740 F.3d at 203. The exemption applies, moreover, both to the disclosure of "details about a law enforcement technique or procedure itself" and to disclosures revealing "'when . . . agencies are likely to employ' certain techniques or procedures.'" *Sheridan v. U.S. Off. of Pers. Mgmt.*, 278 F. Supp. 3d 11, 19 (D.D.C. 2017) (quoting *Sack*, 823 F.3d at 694. Exemption 7(E) does not exempt techniques and procedures "already well known to

the public." H.R. Rep. No. 93-1380, at 229 (1975); *see also Shapiro v. U.S. Dep't of Just.*, 153

F. Supp. 3d 253, 273 (D.D.C. 2016). But it does protect "confidential details" regarding

techniques and procedures even if their "general contours [are] publicly known." *Sussman v.*

*U.S. Marshals Serv.*, 494 F.3d 1106, 1112 (D.C. Cir. 2007) (citing *Blanton v. Dep't of Just.*, 64

F. App'x 787, 788–89 (D.C. Cir. 2003) (per curiam)); *see also Advancement Proj. v. U.S. Dep't*

*of Homeland Sec.*, 549 F. Supp. 3d 128, 145 (D.D.C. 2021).

       1.    *Residential Addresses and Attempts to Locate Non-Citizens*

     ICE invokes Exemption 7(E) to "protect from disclosure information pertaining to law

enforcement gathered and located residential addresses and attempts to locate at-large non-

citizens." Dkt. 26-2 at 33 (Pineiro Decl. ¶ 105). "Specifically, the information identifies specific

locations that ICE is aware of where at large non-citizens may be located," it "includes ICE[']s

next enforcement steps in locating the non-citizens at issue," and it reveals "how many officers

will be utilized, when and how the location will be targeted[,] and how the enforcement action

will take place." *Id.* at 34 (Pineiro Decl. ¶ 107). Disclosure of this information will, according

to ICE, "reveal techniques and/or procedures for law enforcement investigations or prosecutions

or disclose guidelines for law enforcement investigations or prosecutions which could reasonably

be expected to risk circumvention of the law." *Id.*

     The Court agrees that the disclosure of the precise addresses at which non-citizens

targeted for removal "may be located" would reveal procedures for law enforcement

investigations—that is, the specific targets of future enforcement actions—that could invite

circumvention of the law. But ICE fails to explain how disclosure of only the city, state, and

country would pose such a risk. If ICE discloses that a non-citizen resides in Los Angeles,

California, for example, that disclosure would not reveal anything about how ICE went about

collecting that information or how the agency intends to use it.  Nor would such a disclosure risk

circumvention by the targets of those future enforcement actions.  Because ICE does not offer

any examples or otherwise explain (in non-conclusory terms) how disclosure of that limited

information could reveal law enforcement techniques and procedures, the Court concludes that

ICE has failed to support the *wholesale* withholding of this information under Exemption 7(E).

ICE stands on firmer ground with respect to its withholdings related to its past and future

attempts to locate non-citizens.  ICE redacted details regarding enforcement actions it took in the

past, as well as "the particular enforcement action that was to take place and how that

enforcement action was going to be executed."  *Id.* at 33 (Pineiro Decl. ¶ 106); *see, e.g.*, Dkt. 26-

3 at 148–49 (*Vaughn* Index) (redacting the specific enforcement action that ICE planned to take

next with respect to the non-citizen at issue in the record).  ICE asserts that disclosure could

"compromis[e] the security of ICE enforcement actions, should bad actors learn the specific

location of planned enforcement activities and how those activities will be executed."  Dkt. 26-2

at 34 (Pineiro Decl. ¶ 109).  The Court concludes that ICE has explained how disclosure would

reveal a law enforcement investigation procedure and has "demonstrate[d] logically" how the

release of this information could assist those seeking to circumvent the law.  *Blackwell*, 646 F.3d

at 42.  Information regarding ICE's enforcement operations—such as their operational plans for

enforcement and the number of officers involved—could allow a bad actor to counter those

operations.  *See Pejouhesh v. U.S. Postal Serv.*, 2022 WL 768470, at *4 (D.D.C. Mar. 14, 2022)

(holding that agency's operation plan for executing warrant, including "information about how

many law enforcement officers [would] be utilized," was properly withheld under Exemption

7(E)).  ICE has met Exemption 7(E)'s "low bar" as to this category of information.

2.    *Apprehension Locations*

ICE also invokes Exemption 7(E) "to protect from disclosure information pertaining [to] the specific apprehension locations of non-citizens attempting to enter the U.S. illegally."  Dkt. 26-2 at 35 (Pineiro Decl. ¶ 114).  The withheld information includes "mile markers, roadway addresses and locations, specific lanes of entry at points of entry utilized by the subject non-citizens, as well as the indications utilized by border patrol" that helped identify specific non-citizens.  *Id.* (Pineiro Decl. ¶ 115).  ICE argues that the withheld material contains information "used in furtherance of maintaining border security," which "could reveal techniques and procedures, as well as guidelines for law enforcement investigation or prosecutions," Dkt. 26-3 at 247 (*Vaughn* Index), and that "disclosure risks circumvention of the law because bad actors could learn 'of border security vulnerabilities [and] where DHS is focusing its attention,'" Dkt. 32 at 25 (quoting Dkt. 26-3 at 248 (*Vaughn* Index)).  AFLF acknowledges that this "could be true" with respect to certain "mile markers, roadway addresses, [and] specific lanes of entry at points of entry," but maintains that it is not true for all locations.  Dkt. 33 at 24.  AFLF observes, for example, that "it certainly would not be a surprise to anyone that noncitizens were apprehended in El Paso, Texas."  *Id.*

AFLF's argument misses the mark.  Although any given location standing alone may not reveal much about ICE's techniques and procedures, the compilation of these data "might create a risk of circumvention of the law."  *Blackwell*, 646 F.3d at 42; *see also Am. Immigr. Council*, 464 F. Supp. 3d at 244–45 (holding that ICE's apprehension location data could be used to circumvent the law, and thus qualified for withholding under Exemption 7(E)).  By comparing the rate of apprehension at different locations, for example, one could determine "where staffing is located and focused," as well as "strengths and weaknesses at individual points of entry,"

which would "allow bad actors to target or avoid certain places to illegally enter the United States." Dkt. 26-2 at 36 (Pineiro Decl. ¶ 117). This is true even for "unsurprising" apprehension locations, when the data are considered in the aggregate. A comparison between San Diego and El Paso, for instance, could show that one is more crowded or has more agents, effectively steering individuals towards one entry point over another. The Court, accordingly, concludes that this information is exempt under Exemption 7(E).

> 3.    *Gang, Cartel, Terrorist Group Affiliation, and Monikers*

Finally, ICE invokes Exemption 7(E) to justify its withholdings of "the names of specific gang, cartel and terrorism groups, of which the non-citizens are alleged to be affiliated with, as well as monikers that the non-citizens utilize in connection with that affiliation." Dkt. 26-2 at 39 (Pineiro Decl. ¶ 128). The Pineiro Declaration explains that "the names and monikers themselves are law enforcement sensitive, as they were generated based upon law enforcement intelligence and evaluations." *Id.* at 40 (Pineiro Decl. ¶ 131). In ICE's view, disclosure would risk revealing its "techniques and/or procedures" because it employed sensitive techniques and procedures to gather this information. *Id.* (Pineiro Decl. ¶ 132).

The Court agrees with AFLF that ICE has not adequately carried it burden to justify its invocation of Exemption 7(E) with respect to this information. Without further explanation, the Court fails to see how disclosure of affiliations and monikers would reveal how ICE went about collecting that information—or would reveal any other technique, procedure, or guideline for law enforcement investigations or prosecutions. As with ICE's invocation of Exemption 7(C), however, the Court recognizes that there could be exceptions. If divulging this information would compromise ICE's sources inside a certain gang, or reveal that it has infiltrated a criminal organization, that would likely reveal sensitive law enforcement techniques or procedures and

would likely permit bad actors to circumvent those activities.  But ICE has not made this claim,

and the Pineiro Declaration does not explain the connection between the affiliations and

monikers themselves and the methods used to obtain them.  As a result, the Court reaches the

same conclusion with respect to ICE's withholding of this information under Exemption 7(E) as

under Exemption 7(C):  the mere possibility that the exemption might apply under some

circumstances does not justify a *wholesale* withholding.  The Court will, accordingly, deny ICE's

motion for summary judgment with respect to this withholding, and will grant AFLF's cross-

motion with respect to the *wholesale* withholdings.  But to the extent ICE concludes that

disclosure of particular individuals' affiliations or monikers would reveal confidential law

enforcement techniques or procedures and would jeopardize its law enforcement efforts, it may

redact that information (so long as its redactions are accompanied by detailed justifications).

*Kwoka*, 2018 WL 4681000, at *4.

## E.    Foreseeable Harm

Whether records fall into a FOIA exemption does not end the inquiry.  Under the 2016

amendments to FOIA, an agency may not withhold exempt materials unless the agency

"reasonably foresees that disclosure would harm an interest protected by" the exemption.  5

U.S.C. § 552(a)(8)(A)(i)(I).  To meet its burden under the "foreseeable harm" standard, an

agency must "articulate both the nature of the harm [from release] and the link between the

specified harm and specific information contained in the material withheld."  *Reps. Comm. for

Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (quoting H.R. Rep. No. 114-391,

at 9 (2016)).  Here, ICE argues—and AFLF does not dispute—that disclosing the otherwise

exempt information in the Spreadsheet Report (as determined above) would cause foreseeable

harm to the interests protected by Exemption 7—that is, protecting personal privacy and law

enforcement procedures.  Dkt. 26-1 at 41.  The Court, accordingly, agrees that release of the exempt information in the Spreadsheet Report would cause foreseeable harm.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** summary judgment to ICE as to its withholdings of names, docket numbers, attempts to locate non-citizens, and apprehension locations contained in the Spreadsheet Report, and **GRANTS** summary judgment to AFLF as to *wholesale* withholding of the month and year of birth dates; the city, state, and country information of residential addresses; gang, cartel, and terrorist group information; and monikers. The Court expresses no view on whether disclosure of information in *particular* cases would be tantamount to revealing an individual's identity or would reveal ICE's law enforcement techniques and procedures.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  December 2, 2024